## MERCED MINING COMPANY v. FREMONT et al.

Under existing legislation, the owner of a mining claim has, *in practical effect,* a good vested title to the property, and should be so treated until his title is divested, by the exercise of the higher right of his superior proprietor. His right to protect the property, for the time being, is as full and perfect as if he were the tenant for years, or for life, of his superior proprietor. As his lease is of the *mine,* he is entitled to all the remedies, for its protection, that he could claim if he were the owner, against all the world, except the true owner.

A writ of injunction will lie, to restrain trespass, in entering upon a mining claim, and removing auriferous quartz from it, where the injury threatens to be continuous and irreparable. It comports more with justice to both parties to restrain the trespass, than to leave the plaintiff to his remedy at law.

Moreover, it would be impossible to estimate, with any approach to accuracy, the damage done; and hence, the greater necessity of preventing what cannot be adequately compensated.

The removal of gold from a mine is emphatically taking away the entire substance of the estate, and comes within that class of trespass in which injunctions are now universally granted.

*Per Murray, C. J., dissenting.*—The plaintiffs' bill alleging that the plaintiffs own the soil, and that the mine belongs to the State, by whose license the plaintiffs are working it, a trespass upon the mine, and the removal of auriferous quartz therefrom, is not an injury to the inheritance, and, in order to obtain an injunction, it must be shown that the injury is irreparable.

The mere depriving the plaintiff of a quantity of gold-bearing quartz is not an irremediable injury, in the sense which will entitle him to an injunction.

APPEAL from the District Court of the Thirteenth Judicial District, County of Mariposa.

This is an appeal from an order of the Court below, granting an injunction. The plaintiffs allege that they are the owners and possessors of certain described real estate, and veins of gold-bearing quartz; that they took possession of them, and have been working them, for the purpose of extracting the gold from the rock, and have expended upon the property upwards of eight hundred thousand dollars; that defendants claim an interest adverse to the plaintiffs, but that the defendants have no title; that the title to the minerals in the soil of California is in the State; that defendants are trespassing upon a portion of the premises, and working the mineral veins therein, and avow their intention to take possession of the entire property. The complainants pray that the adverse claim of defendants may be determined by the Court, and for an injunction pending the litigation, and that the same, on the hearing, may be made perpetual.

*Robinson, Beatty & Botts,* for Appellants.

It is urged that the order granting the injunction should be sustained, because the complaint alleges ownership in the plaintiff, and that character of injury which the law esteems irreparable; and in support of this last proposition, we are referred to § 929, Story's Eq. Juris.

21

There is no doubt that the remedy by injunction has been extended by modern decisions to the case of a mere trespasser, where the injury committed has been one that if done by a privy in estate, would have been what is technically known as waste.

As this Court has frequently said, this writ of injunction is the right arm of the law, and is not to be brought into exercise upon trivial and ordinary occasions.

In trespass it is confined to two classes of cases, where, first, it is done to the inheritance, which constitutes waste, which lies at the foundation of the doctrine; and, secondly, where the injury, without regard to the character of the article injured, is of such a character that it cannot be compensated by money. Under the last head comes the case of the insolvency of the trespasser.

We repeat, that injunction to restrain a trespass is confined to cases including injury to the freehold or inheritance, and to such cases as the circumstances exclude the possibility of compensation in damages to be awarded by the judgment of a Court of law.

Now, does the alleged injury in this case come within the category?

It is true that injury to a mine has been held in England sufficient to warrant the intervention of an injunction, but an examination of the cases cited in the note to nine hundred and twenty-ninth section of Story, and also of Livingston v. Livingston, 6 Johns. Chancery, will show that this rests, not upon the ground of irreparable injury, but upon the ground that it is an injury to the inheritance, which, if done by a privy in estate, would have constituted waste.

But in the case at bar, the trespass is no injury to the inheritance or freehold, for whilst the plaintiff claims the ownership of the soil, he informs us that the title to the minerals upon which the trespass is committed belongs to the State of California, and that he is only using them by a license from the State. He had just as well ask an injunction to prevent further injury to hired cattle that happened to be upon the land of the plaintiff.

Nor is this injury of such a character as to prevent an efficacious compensation by a judgment for damages in a Court of law. To this conclusion we should necessarily come by any system of *a priori* reasoning, but for this we have the highest authority—the decision of this Court, in the case of Gates v. Teague, 5 Cal. Rep., where this Court uses the following language:

"Depriving the plaintiffs of a large amount of gold-bearing earth is a loss, but not irremediable in the sense which will entitle them to the relief they seek."

But again, the bill shows that the defendants are not only trespassers, but trespassing under a claim of adverse title.

"I remember being told from the Bench, very early in my life," says Lord Bacon, "that if the plaintiff filed a bill for an account, and an injunction to stay waste, stating that the plaintiff claimed by a title adverse to his, he stated himself out of Court as to the injunction." See Pilesworth *v.* Hopton, 6 Vesey.

*Cook & Fenner, and Booraem,* for Respondents.

BURNETT, J., delivered the opinion of the Court—TERRY, J., concurring.

The questions arising in this case are of the greatest importance, and may be stated thus:

The order granting the injunction was made, upon the facts stated in the complaint, which must be taken as true, for the purpose of determining the points raised on appeal.

1. Can a party, in possession of a mining-claim on public land within this State, sustain a suit to determine the *adverse* title of a party out of possession?

2. And if so, can the plaintiff obtain an injunction, pending the litigation, to prevent the removal of the minerals, in the same manner as if he were the true owner of the soil?

In reference to the first point, the two hundred and fifty-fourth section of the Practice Act provides that "an action may be brought, by any person in possession of real property, against any person who claims an estate or interest therein adverse to him, for the purpose of determining such adverse claim, estate, or interest."

The language of this section is general and comprehensive, and allows any person "*in possession*" to bring the action against any person "who claims" an estate or "interest" adverse to him. The only title the plaintiff is required to have, is that which flows *prima facie* from possession. It has been repeatedly decided by this Court, that possession was *prima facie* evidence of title. 4 Cal. R., 70, 94; 5 Cal R., 40. This provision of the statute is founded upon evident reasons of justice and policy, and is more especially applicable to the present condition of the country. It is evident that both parties, if honest, have an equal interest in knowing the true state of their respective claims at the earliest practicable period, and each party has his appropriate remedy provided by law. The party out of possession can bring his suit to obtain possession of the property, and the party in possession can bring his action to determine the adverse title. The law, by giving both parties the right to sue, affords each the power of protection against the other, and thus secures a *speedy* determination of the doubt—the end intended to be accomplished by the law itself. If the holder of the adverse claim, out of possession, should delay bringing his suit, the party in possession

can force him to produce his claim, and submit it to the determination of the proper tribunal. If a suit be necessary to settle the dispute at all, the sooner it is brought, the better for both parties.

But the beneficial effects of this provision are as applicable to mining-claims as to any other cases. The value of these claims, especially of those containing quartz-lodes, is immense, and the titles often conflicting. To work these quartz-mines efficiently, a very heavy outlay of capital, in the erection of machinery, is required. As an illustration, it is stated, in the complaint in this case, that more than eight hundred thousand dollars had been expended by the plaintiffs. It is, then, of the utmost importance that parties engaging in these extensive and beneficial enterprises, should have some means of determining all adverse claims · before they make their costly improvements. If this right is not extended to mining-claims, then this most important interest of the State is without adequate protection, and there is a manifest failure of justice.

If, then, it be conceded that a party in possession of a mining-claim can sustain an action to determine an adverse outstanding claim, can he not obtain an injunction to protect the property pending the litigation? Is not an injunction *pendente lite* a remedial favorite in equity, and especially so, when asked by a party in the actual possession of a *mine*, against a party out of possession?

That the plaintiffs could obtain this injunction, had they the title in fee simple, there would seem to be no doubt. It is true that Courts of Equity were once reluctant in granting an injunction to prevent a mere trespass. At first the remedy was confined to cases of technical waste, when privity of title existed between the parties. The history of this change is concisely stated by Lord Eldon, in his opinion delivered in the case of Thomas *v.* Oakley, 18 Vesey Jr., 184: "Throughout Lord Hardwick's time, and down to that of Lord Thurlow, the distinction between waste and trespass was acknowledged, and I have frequently alluded to the case upon which Lord Thurlow first hesitated:—A person having a close demised to him, began to get coal there, but continued to work under the contiguous close belonging to another person, and it was held that the former, as waste, would be restrained; but as to the close not demised to him, it was a mere trespass, and the Court did not interfere. But I take it that Lord Thurlow changed his opinion upon that, holding that if the defendant was taking the substance of the inheritance, the liberty of bringing an action was not all the relief to which, in equity, he was entitled. The interference of the Court is to prevent your removing that which is his estate. Upon that principle, Lord Thurlow granted the injunction as to both. That has since been repeatedly followed, and whether it was trespass

Merced Mining Co. *v.* Fremont.

under the color of another's right actually existing or not. If this protection would be granted in the case of timber, coal, or lead ore, why is it not equally to be applied to a quarry? The comparative value cannot be considered."

This distinction between waste and trespass, so far as regards the power of the Court to grant an injunction, has been set aside, and "it is now 'granted,' " says Mr. Justice Story, "in all cases of timber, coals, ores, and quarries, when the party is a mere trespasser, or when he exceeds the limited rights with which he is clothed, upon the ground that the acts are, or may be, an irreparable damage to the particular species of property." The same hesitation was once manifested by the Courts in restraining the publication of private letters, except those on business. "Fortunately for public as well as private peace and morals," says the same author, "the learned doubts on this subject have been overruled, and it is now held that there is no distinction between private letters of one nature, and private letters of another."

In reference to the subject of injunctions, the same writer, after stating that they "are now more liberally granted than in former times," makes these practical and judicious remarks: "It may be remarked, in conclusion, upon the subject of special injunctions, that Courts of Equity constantly decline to lay down any rule which shall limit their power and discretion as to the particular cases in which such injunctions shall be granted or withheld. And there is wisdom in this course; for it is impossible to foresee all the exigencies of society, which may require their aid and assistance to protect rights and redress wrongs. The jurisdiction of these Courts, thus operating by way of special injunction, is manifestly indispensable for the purpose of social justice in a great variety of cases, and therefore should be upheld by a steady confidence." Story's Eq. Jur., §§ 863, 929, 948, and 956 b.

The ground upon which the injunction was granted in these cases of timber, coals, ores, and quarries, was that the trespasser, in the language of Lord Eldon, was "taking away the very *substance of the estate.*" If a party enter upon the premises of another, and occupy them for the purposes of husbandry, and cultivate them in a proper manner, so as not materially to diminish the value, when they shall afterwards come into the possession of the rightful owner, the Courts will not grant an injunction to restrain the party in possession, pending the litigation, for this would be of no benefit to the owner, and might be an injury to both parties. But when the alleged trespasser is taking *away* that which cannot be replaced, and which constitutes the substance of the mine itself, so as to diminish its value when restored to the owner, it constitutes a very different case.

It must be conceded that the principles of these cases apply

to *gold* mines, as well as to others. In fact, there are circumstances connected with gold mines that render the remedy by injunction more appropriate than to other mines. The only value of a gold mining-claim, in most cases, consists in the mineral. For timber, for cultivation, and for other purposes, they are generally valueless. If a party removes the gold, he removes *all* that is of any value in the estate itself. It is emphatically taking away the entire substance of the estate. Another material circumstance is the impossibility of making any certain estimate of the amount of injury done. In the case of a coal mine, or stone quarry, the amount removed can be substantially ascertained by admeasurement. So in the case of timber trees, their size, number, and value, can be substantially ascertained. But in reference to gold mines, this is not the case. There is no mode of estimation that even approaches to substantial accuracy, and hence the greater necessity for preventing that injury which you cannot estimate, and, therefore, cannot compensate adequately.

In the case of Gates v. Teague, October Term, 1856, this Court held, that the mere allegation that the injury was irreparable, would not, in itself, be sufficient, but the complaint must show how. The same is stated as the rule in the case of Amelung and others v. Seekamp, 9 Gill. and John., 474. This is, no doubt, the correct rule, and facts must be stated to justify the conclusion of irreparable injury. But in the cases of mines, timber, and quarries, the statement of the injury is sufficient. In the nature of the case, all the party could well state, as matter of fact, is the destruction of the timber in the one case, and the taking away the minerals in the other. Taking away the minerals is itself the injury that is irreparable, because it is taking away the substance of the estate. The allegation of insolvency is not necessary to procure the injunction in these cases. The right to the remedy is based upon the *nature* of the *injury*, and not upon the incapacity of the party to respond in damages. And in reference to the element of insolvency, it may be remarked, that the rule established under a system which permitted imprisonment for debt, and, therefore, gave more efficiency to the remedy at law, should be received with some modifications under our system. The reason of the rule being modified, the rule itself should receive a corresponding qualification. And in practice it is generally difficult to prove insolvency, except after the return of an officer, upon execution. To rely upon the personal responsibility of an individual for compensation for serious injuries, is what practical men would hesitate to do, when they can avoid it. And I agree with Chancellor Johnson, in the case of Kinsler v. Clark, 2 Hill. Ch. R., 618, that it comports " more with substantial justice to both parties to restrain the trespass, than to leave the plaintiff to pursue his remedy at law."

The complaint in this case alleges that the defendants com-

mitted the acts charged under an invalid or adverse claim. This statement, under the English decisions at one time, would have been fatal to the case. But the rule then has been since changed. In the case of Smith v. Callyer, 8 Vesey, Jr., 90, Lord Eldon said : " I remember when if a plaintiff stated that a defendant claimed by an adverse title, he stated himself out of Court." Again, in the case of Norway v. Rowe, 19 Vesey, Jr., 154, the same Chancellor said : " I recollect hearing from either Lord Thurlow or Lord Bathurst, that if a bill contained a passage, which is frequently inserted now, that the defendant pretends the plaintiff is not entitled to the estate, he stated himself out of Court."

But it seems to be the general rule in England, that if the answer positively denies the exclusive right of the plaintiff, then the injunction will be dissolved. This is based upon the practice of not permitting affidavits to be read to contradict the answer as to the *question of title.* 8 Vesey, Jr., 89 ; 9 Vesey, Jr., 155. In reference to other questions, they may be read. As the denial of the defendant is under oath, and the plaintff is not allowed to contradict the answer, of course the injunction must be dissolved. Still this rule is not inflexible. 7 Vesey, Jr., 305, and notes. In the case of Livingston v. Livinston, (6 John. Ch. R., 202,) Chancellor Kent said : " This case is analogous to a case before Lord Camden, referred to by the counsel in Mogg v. Mogg, and which Lord Thurlow seemed to approve of. It was when a defendant claimed the right of *estovers,* and, under that right, cut down timber ; there was a claim of right, and until it was determined, it was proper to stay the party from doing an act which, if it turned out he had no right to do, would be irreparable. So, also, in Hanson v. Gardiner, (7 . Vesey, 305,) the injunction was granted when the defendant claimed common of pastures and *estovers."* In the case of Amelung and others v. Seekamp, (9 Gill & John., 468,) it was held that an injunction would not be granted to restrain trespass pending the proceedings to try the right, except in cases of irreparable mischief, or to prevent a multiplicity of suits, or when peculiar circumstances imperatively demanded such a remedy. The same rule seems to prevail in South Carolina. (2 Hill Cha. Rep., 618.) In this case Chancellor Johnson said : " Injunctions to restrain trespass, where irreparable mischief would be effected before a trial at law could be had, are now regarded with more favor."

It is not, however, necessary in this case to lay down any rule as to the proper course to be taken upon the coming in of the answer containing a positive denial of the plaintiff's exclusive right. There is no distinction between the effect of an allegation in the complaint that the acts were committed under pretence of an adverse title, and the sworn statement in the answer. A

man may pretend to claim what he would not solemnly set up in the answer.

The allegation in the complaint that the defendants justified under an adverse claim, will not in any sense prejudice the right to the injunction.

Conceding then, for the sake of the argument, that the plaintiffs have shown themselves the owners of the premises described in the complaint, there could be no reasonable doubt as to their right to the injunction. The case comes substantially within the rule laid down by Chancellor Kent in Livingston *v.* Livingston, that "there must be something *particular* in the case, so as to bring the injury under the head of quieting possession, or to make out a case of irreparable mischief, or when the value of the inheritance is put in jeopardy." The particular circumstance of this case is, that the injury consists in removing the minerals from a gold mine, thus taking away the very substance of the estate. It is not, if the complaint be true, an ordinary and naked trespass. Another circumstance which ought to have some effect, is the fact, that the action is brought to quiet the possession, and the injunction was granted "*pendente lite.*"

If these views be correct, it then becomes important to inquire what protection the law gives to parties holding mining-claims upon the public lands within this State. This inquiry will involve the examination of the various decisions of this Court in reference to this subject.

In the case of Hicks *v.* Bell, (3 Cal. Rep., 219,) this Court decided that "in reference to the ownership of public lands, the United States only occupied the position of any private proprietor, with the exception of an express exemption from State taxation. The mines of gold and silver on the public lands are as much the property of this State, by virtue of her sovereignty, as are similar mines in the lands of private citizens. She has, therefore, the sole right to authorize them to be worked; to pass laws for their regulation; to license miners, and to affix such terms and conditions as she may deem proper to the freedom of their use." The doctrines of this case are expressly affirmed in the subsequent case of Stoakes *v.* Barrett & Co., (5 Cal. R., 39.) In the case of McClintock *v.* Bryden and others, (5 Cal. R., 97,) it was held "that the act of April 13th, 1850, passed for the better regulation of the mines and the government of foreign miners, seems to give, by necessary implication, whatever right the State might have in the mineral in the soil, and the right to mine to all native born or naturalized citizens of the United States who may wish to toil in the gold placers." The six hundred and twenty-first section of the Practice Act, would seem to imply the same right. In the case of Irwin *v.* Phillips and

others, (5 Cal. R., 146,) Mr. Justice HEYDENFELDT, in delivering the opinion of the Court, uses this language:

" Courts are bound to take notice of the political and social condition of the country which they judicially rule. In this State the larger part of the territory consists of mineral lands, nearly the whole of which are the property of the public. No right or intent of disposition of these lands, has been shown either by the United States or the State Government; and with the exception of certain State regulations, very limited in their character, a system has been permitted to grow up by the voluntary action and assent of the population, whose free and unrestrained occupation of the mineral region has been tacitly assented to by the one government, and heartily encouraged by the expressed legislative policy of the other." In this case, the doctrine of the common law, which prescribes that a watercourse must be allowed to flow in its natural channel, was held to be inapplicable to our mineral region, and that therefore a party had a right to divert the waters of a stream from their natural channel, for mining purposes. So in the case of Tartar v. The Spring Creek Water and Mining Company, the Court held this language: " The current of the decisions of this Court go to establish that the policy of this State, as derived from her legislation, is to permit settlers in all capacities, to occupy the public lands, and by such occupation to acquire the right of undisturbed enjoyment, against all the world but the true owner." And, finally, in the case of Hoffman and others v. Stone and others, decided at the last January Term, this Court used this language: " The former decisions of this Court in cases involving the right of parties to appropriate waters for mining and other purposes, have been based upon the wants of the community and the peculiar condition of things in this State (for which there is no precedent,) rather than any absolute law governing such cases. The absence of legislation on this subject, has devolved on the Courts the necessity of framing rules for the protection of this great interest, and in determining these questions we have conformed as nearly as possible to the analogies of the common law."

The sentiment that " Courts are bound to take notice of the political and social condition of the country which they judicially rule," is as just as its expression is concise and appropriate. And Courts knowing the political and social condition of the country, are equally bound to apply the rules of law and the principles of enlarged reason, to the new circumstances of a people.

It is the boast of the common law, as of every other system of enlightened jurisprudence, that its principles, when legitimately applied, will afford a redress for every substantial injury. And especially is it the distinguishing characteristic of equity, that while its rules are certain, its expansive principles are ample enough to embrace all new cases. The *circumstances* of a case

may be new, but there is always some known principle or a new *combination* of known principles, applicable to it. Law, in fact, is but the rules of common sense, and the principles of justice, applied to circumstances as they really exist. And it is upon this sensible ground that Courts of Equity have wisely refused to lay down any limits to their right to grant special injunctions. The right must be exercised with due caution, but it must be exercised in proper cases.

Under the novel state of things existing in this country, great interests have grown up, and have been fostered and protected. Large amounts of capital and labor have been expended in improvements upon mining-claims in every part of the mining region. And whatever may be the comparative value of different claims, the *bona fide* possessor has an equal right to protection. Under the current of decisions of this Court, conflicting claims to the use of water, as well as to the possession of mining-claims, may be settled. The party has rights that the law will protect; and if the law protects him at all it should give him efficient practical protection. Any other protection might fail to attain the very end intended.

If it be true that the minerals found in a mining-claim, as a general thing, constitute its only value—that by the current of legislation, both of the Federal and State governments, the holder is there by the license of both governments, and that under this comprehensive license he is allowed, and even encouraged, to take from the premises *all* that is of any value, then it would seem to follow, as a necessary and inevitable result, that the party thus in possession could sustain any and all remedies necessary to protect the property for the time being. So long as the real owner permits him to occupy the premises and extract the minerals, not as a wanton trespasser, but as a favored and licensed possessor, so long he has the right to rely upon the title of the superior under whom he holds, and to resort to any remedy the government could maintain against a wrong-doer.

It is true, that while the acts of Congress specially reserve these mineral lands from the right of pre-emption, and the acts of the State Legislature contain various provisions regulating the mines, neither the one, nor the other, have conferred in express terms, any specific title upon the holder of a mining-claim. Yet these acts, especially those of the State, have virtually assumed the right to exist; otherwise there could have been no rational basis, upon which this legislation could be predicated. When we consider the current and the spirit of the legislation of both governments, taken in connection with the history and the known circumstances of the country, the conclusion is irresistible, that the mines are occupied and worked, with the clear assent and encouragement of both governments. And while the terms of this license, and the relation which the miner sustains

to the superior proprietor, may not be expressly laid down, and the duration of the estate not clearly designated by any positive law, and we may not, for these reasons, be able to give any exact definition of the precise nature of the right; yet one thing is well understood and indisputable, they are there, by the clear license of both governments, and have such a title as will hardly be divested, even by the act of the superior proprietor. There are equitable circumstances connected with these mining-claims, that are clearly binding upon the conscience of the governmental proprietor, that this Court must, with all due respect, presume will never be disregarded. Rights have become vested in virtue of this license, that cannot be divested without a violation of the principles of justice and reason. Conger et al. *v.* Weaver et al., Oct. Term, 1856.

If these views be correct, the owner of a mining-claim has, in *practical effect,* a good vested title to the property, and should be so treated, until his title is divested, by the exercise of the higher right of the superior proprietor. His rights and remedies, in the meantime, are not trammeled by the consideration that the higher right to reclaim the property exists in another, which right may *possibly,* but will not *probably,* be exercised. His right to protect the property for the time being, under the peculiar circumstances of the case, is as full and perfect as if he was the tenant of the superior proprietor, for years or for life.

If a party leases from another a tract of land for agricultural purposes, upon which there is a mine, any irreparable injury to the mine would not affect *his* estate, but the injury would be to the estate of the landlord, and the remedy, in respect to that injury, must be sought by the latter. But where the lease is of a *mine,* the case is entirely different. The injury, in that case, is to the estate of the tenant, and he is the proper party to sue.

Of the right of the tenant to sustain an injunction, pending a suit to settle the title in such a case, there would seem to be no doubt; provided, the title of his landlord, itself, be sufficient. A tenancy is but a smaller estate, carved out of a greater. It is shorter in duration, but equally exclusive, while it lasts. All the rights that belong to the larger estate are incident to the tenancy *for the term,* except such as are reserved, from the nature of the case, or by the express terms of the lease. If, therefore, the estate of the tenant suffers irreparable injury, the right to restrain it would seem to be as clear as the right to sustain eject-ment or trespass, under proper circumstances.

And in reference to a mining-claim, under the circumstances actually existing in this State, the injury to the mine, is, to all intents and purposes, an irreparable injury to the estate of the holder. Unless restrained, the intruder may take away not only that which is of the substance of the existing estate, but *all* that is of any value. The right of the holder, whatever you may

define it to be, is, practically, valuable, if protected "against all the world but the true owner." It would seem to be the duty of the Courts to give this protection.

It must be conceded that Courts should exercise due discretion in granting injunctions to restrain alleged irreparable mischiefs. Parties are sometimes improperly restrained, to their serious injury. When the title of the plaintiff is disputed in the answer, the Courts should be still more cautious. But in all cases, it is matter of sound discretion. It may be properly said, however, that when there is reasonable ground to apprehend the commission of irreparable mischief, pending the litigation, and the title be matter of doubt, the Courts should restrain both the parties, or appoint a receiver, under proper circumstances. The party restrained, in a case of reasonable doubt, has, at least, these advantages: First, The property is left untouched for the time, and, upon the termination of the suit in his favor, returns to him unimpaired. Second, He has not only his remedy against the opposite party, but also against his sureties. But in case the party is not restrained, and the suit should terminate adversely to him, the other party must rely *solely* upon his personal responsibility. It is true, notwithstanding all these advantages, he may suffer very seriously; but as it is matter of doubt who has the right, and some one must incur the risk pending the litigation, the risk would be less on his than on the other side.

Whether the right to the minerals in the soil of California be in the State or in the United States; (and in reference to which it is unnecessary to express any opinion,) the right of the plaintiffs to the injunction would be equally clear. What their rights would be upon the coming in of the answer, does not arise in this case. This opinion is solely predicated upon the facts stated in the complaint.

For these reasons, I think the order granting the injunction was correct, and that the judgment should be affirmed.

MURRAY, C. J.—This appeal is prosecuted from an order of the Court below, granting an injunction. The plaintiffs allege that they are the owners of certain premises described in the bill; that they entered upon and took possession of the same for the purpose of working the gold-bearing quartz and other precious metal therein contained; that the defendants have intruded upon their possession, under a claim of title to the soil, which they allege is unfounded and void, and are working said quartz-claims, and threatening to carry away the gold-bearing earth and quartz, and to deprive the plaintiffs of their premises.

The bill alleges irreparable injury, and prays an injunction until the rights of the parties can be ascertained and determined.

Under the old practice, Courts of Equity seldom or never in-

terfered to prevent trespass, but the rule has been relaxed by modern decisions, and is thus stated by Story, in his Commentaries on Equity Jurisprudence: "Formerly, indeed, Courts of Equity were extremely reluctant to interfere even in cases of repeated trespasses, but now there is not the slightest hesitation, if the acts done or threatened to be done to the property would be ruinous or irreparable, or would impair the just enjoyment of the property in the future. Thus, for instance, where a mere trespasser digs into and works a mine to the injury of the owner, an injunction will be granted, because it operates a permanent injury to the property."

Among other cases relied on to support this doctrine the learned commentator refers to that of Livingston v. Livingston, 6 Johns. Chancery Reports, in which Chancellor Kent thus sums up the rule: "The recent case of Garstin v. Asplin (1 Madd. Ch. R.,) shows that it is not the general rule, that an injunction will lie in a marked case of trespass, where there is no privity of title, and where there is a legal remedy for the intrusion; there must be something particular in the case, so as to bring the injury under the head of quieting the possession, or to make out a case of irreparable mischief,. or, where the value of the inheritance is put in jeopardy."

The counsel for the plaintiffs doubtless had this authority in his mind at the time he instituted this suit, which seems to be of a double character, as a bill of peace, and to restrain a threatened trespass, and if he had simply counted on title to the land he might have maintained it. The rule, however, is, that the pleading must be taken most strongly against the pleader. The bill first alleges, that the plaintiffs are the owners of certain land, describing it, and then goes on to state they entered upon and took possession of the premises, consisting of quartz-leads, etc., for the purpose of working the same; that the gold belonged to the State, and that they were there by virtue of a general license of the State to work said minerals.

It is evident, from the whole bill, that the plaintiffs do not count on their ownership of the soil, and proprietary right to the minerals as appurtenant thereto, for if they were owners, then, under our previous decisions, without some specific legislation on the subject, no one would have a right to intrude upon their premises for the purpose of mining. They seem to rely entirely on their prior location and appropriation of the quartz-veins in controversy.

The injury complained of, not being to the inheritance, in order to sustain this injunction must be shown to be irreparable. The bill does not allege the insolvency of the defendants, nor any fact or circumstance tending to establish that such is the case, except so far as we would be bound to infer from the nature of

the matters involved, that it would probably be impossible to ascertain the amount of damages sustained by the defendant.

It is true that it might be somewhat difficult to fix any correct standard by which the plaintiffs' damages could be ascertained, but it is no less true that the rule would be equally uncertain and unsatisfactory if the plaintiffs, should be cast in this action. The fact that the controversy involves quartz-veins, or gold-bearing earth, is not sufficient in itself to warrant this Court in assuming that the injury compained of must necessarily be irreparable. The plaintiff ought to have brought himself within the rule of Livingston v. Livingston, before quoted.

The questions involved in this suit have been substantially settled in the case of Gates v. Teague et al., October Term, 1856, in which this Court uses the following language : " True, it is said that the injury will be irreparable, but it does not show how; depriving the complainants of a large amount of gold-bearing earth is a loss, but not irremediable in the sense which will entitle them to the relief which they seek."

I am satisfied, upon an examination of the plaintiffs' bill, that the case made by it did not warrant the issuing of the injunction. This I think is the only question involved. I am compelled, therefore, upon my understanding of the case, to dissent from the majority opinion of the Court. I think the order granting the injunction should be reversed.