GILLETT et al. *v.* GAFFNEY et al.

1. Title by occupancy of land subject to entry under the acts of congress, as town sites, must under the statute (1 Sess. Laws, p. 168) of Colorado, be held to be descendible.   Such title possesses, under the statute, the legal character of real estate.

2. Except as against the United States, and subject to defeat by abandonment, the *bona fide* occupant will hold his land by a tenure as secure against attack as the owner of the fee at common law.   There is nothing in the law which obliterates its legal character upon demise, and there is nothing that invests it with a different character upon transmission to the heir.

3. If one co-tenant acquire an outstanding title he will be considered as holding it in trust for his co-tenant.   But in case of co-tenancy of land, with

the fee in the United States, one co-tenant, by compliance with the requirements of the statute (R. S. 619 *et seq.*), having acquired title, cannot be held to come within the rule touching co-tenants as trustees, in case of the acquisition of an outstanding title.

Thus, where A and B are co-tenants of land subject to entry as a town site, and before the entry is made A dies, leaving heirs, and B conveys to C an undivided half of the land, and B and C thereafter acquire title from the government, the heirs of A having taken no steps to that end : *Held*, that C held his moiety free and discharged from the claims of B's heirs.

4. Where one has a power coupled with an interest in lands, his deed of the lands making no mention of the power, will convey only his own interest. Thus, where A and B are co-tenants of lands owned in partnership, and A dies, leaving heirs, and B as surviving partner, and having power to con¯ vey, conveys an undivided moiety to C, describing himself as surviving partner merely : *Held*, that B conveyed only his own interest, and the conveyance operated only to sever his relation as co-tenant with the heirs. of A, and as surviving partner of A, he held the remaining moiety in trust for the heirs of A, and that in such case B, also dying, his heirs took the estate charged with these equities, and held the same in trust for A's heirs, subject, however, to the debts of the late firm of A and B.

5. A deed duly recorded is constructive notice of its existence and contents to all persons claiming what is thereby conveyed under the same grantor, by subsequent purchase,.but not to other persons; and in this case : *Held*, that the adult heirs of A, being strangers to the conveyance from B to C, could not be held to notice of such recorded deed, and be thereby barred by the statute of limitations, of their action against B's heirs.

*Appeal from District Court of Arapahoe County.*

JAIRUS RICHARDSON and Hawley H. Gillett were copartners doing business in the city of Denver, from 1860 to the 29th of January, 1865. The premises occupied by them during this term are the premises in controversy, and were possessed and occupied by the firm under title from the Denver Town Company, the fee being in the United States. On the 29th of January, 1865, Richardson died leaving Maria E., his widow (now Maria E. Gaffney), and three minor children, his heirs, who are the complainants in this suit. After the death of Richardson, Hawley H. Gillett continued the business, and in July, 1865, conveyed to his brother, George Gillett, a one undivided one-half of the premises occupied by the late firm. Prior to this convey-

ance, and on the 6th of May, 1865, the probate judge of
Arapahoe county entered the town site of Denver, under
the act of congress of May 28, 1864.' On the 11th day of
August, 1865, Hawley and George obtained from the pro-
bate judge a deed of the premises to themselves. They
continued to occupy and enjoy the same until the 13th day
of September, 1868, at which time Hawley died, leaving
Emma, his widow, and two minor children, his heirs, who,
together with George Gillett, the complainants allege, have
held, occupied and enjoyed the premises in controversy, to
the exclusion of the complainants, and who, together with
John W. Webster, the administrator of Hawley, are made
parties defendant. The bill prayed a partition of the
estate, or sale in the event that partition could not be made
without injury, and also that the court might decree that
the legal title now held by said George Gillett, and the
said heirs of Hawley, to the said real estate, "is so held in
fraud of the rights of complainants, as to one undivided
moiety thereof; and that the same be taken and held by
the court here as in trust as to the said moiety for the use
of complainants, according to their respective interests;
and that such order and decree may be made in the prem-
ises as will vest the title to said moiety in the complainants,
according to their respective interests therein; and that the
said defendants, or such of them as have received the rents
and profits of said real estate from the time of the death of
said Jairus Richardson hitherto, be compelled to account
for the same, and pay to the complainants the share of the
same to which they may be found entitled," etc.

Webster demurred, the demurrer was overruled; he de-
clined to answer, and a decree was taken against him *pro
confesso*. The other defendants answered. After replication
filed the cause was referred to a master to take proof. The
cause was finally submitted upon the bill, answer, replica-
tion and master's report, and a decree was rendered that
the title to the undivided one-half of the premises was "in
the defendant George Gillett, free and discharged of any
lien or claim of lien of the complainants; that the legal

title to the other undivided moiety of said lands, premises and appurtenances at the.time of the death of Hawley H. Gillett, deceased, was vested in him, and he held the same in equity as surviving partner of the firm of Richardson & Gillett, the members. of which firm had theretofore been composed of Jairus Richardson, then deceased, and the said Hawley H. Gillett, deceased, both late of the county of Arapahoe and Territory of Colorado ; that the said Jairus Richardson, at the time of his death, left him surviving his widow, now being the complainant Maria E. Gaffney, and the other complainants, his children and only heirs at law; that the said Hawley H. Gillett, deceased, at the time of his death, left him surviving the said defendant, Emma Gillett, his widow, and the said defendants, John A. Gillett and Hawley H. Gillett, his children and sole heirs at law.    That the said Hawley H. Gillett, in his life-time, as said surviving partner of said firm, settled up and adjusted the affairs of said firm with the administrator of said Jairus Richardson, deceased, leaving the title to the last-mentioned undivided moiety of said real estate vested in him as equitable assets of said firm, undisposed of in trust for himself and the said widow and children of the said Jairus Richardson, deceased.    That at the death of said Hawley H. Gillett, deceased, the title to the said last-mentioned moiety descended to the said heirs at law of the said Hawley H. Gillett, in trust for themselves and the said widow of the said Hawley H. Gillett and the said complainants, according to their respective interests.''    It was further ordered that this last-mentioned moiety be sold by the master, and the proceeds be brought into court to be distributed.    To reverse this decree the appellants prosecute this appeal.

Mr. V. D. MARKHAM, and Mr. JOHN W. WEBSTER, for appellants.

Mr. H. P. BENNET, and Mr. E. L. JOHNSON, for appellees.

ELBERT J.    The bill in this case seeks the declaration of a resulting trust and an account of rents and profits.

Whatever may have been the intention of the pleader, the bill will not admit a broader decree.

Jairus Richardson died in January, 1865, leaving the complainants as his heirs at law. Prior to, and at the time of his demise, he was the copartner of Hawley H. Gillett, whose administrator, widow and heirs are defendants. ·They pursued their partnership business in shops erected on the premises in controversy, which they occupied as tenants in common, under purchase and conveyance from one Curtis. During the co-occupancy, and at the time of Richardson's death, the fee was in the United States. In the May following the Denver town site was entered by the probate judge, in trust, under the Denver town site act of May 28, 1864. Subsequently the premises were conveyed to Hawley H. Gillett and his brother George by the probate judge, under circumstances hereafter more fully explained.

The widow and heirs of Richardson file their bill to recover the undivided half of the premises.

At the threshold they are met with the objection that their ancestor was not possessed of a descendible estate in the property to which they seek to establish their claim as his heirs.

We do not understand the counsel for appellants seriously to question the character of an occupant's interest as property, but to challenge its character as *real estate* descending to the heirs. In view of the universality of titles by occupancy in our State, the question is of deep interest.

Upon the organization of the Territorial government in 1861, the fee to the lands within its borders was in the general government. They were newly subjected to the dominion of man. Settlers located upon farming lands, upon mining claims and town lots, and claimed them in virtue of this occupancy. The general government, by beneficent laws, provided for surveys, for homesteads and pre-emptions, for entry in person and in trust, all looking to the acquisition of the fee by the occupant, and placing it within easy reach. Having the fee in view, in many instances,

large sums were invested, and not unfrequently, these claims and their improvements constituted the entire property of the occupant. Thus a new wealth was produced, and extensive and valuable interests grew up, springing out of, and attached inseparably to lands, and dependent entirely upon title by occupancy. It was the universal tenure by which lands were held and enjoyed. At common law, right of occupancy, strictly so called, was limited to the single instance, where a man was tenant *pur autre vie*, or had an estate granted to himself only (without mentioning his heirs) for the life of another man, in this case on the death of the tenant during the life of the *cestuy qui vie*, it did not descend, but he who first entered on the land might lawfully retain possession by right of occupancy, so long as the *cestuy qui vie* lived. 2 Black. Com. 258. There is nothing in the law of this right as it existed at common law, applicable to the right of occupancy as it is understood and exists here.

Distinct from this, was title by possession, and where a mere naked possession, without apparent right, or shadow, or pretense of right to hold or continue such possession, it was the lowest and most imperfect title known to the common law. The legal owner could put an end to the possession at any time by entry, but until some act was done by him to divest this possession, and assert his title, such actual possession was *prima facie* evidence of legal title in the possessor, and by lapse of time, and negligence of the owner, it ripened into a perfect title. If the disseizor or other wrong-doer died, possessed of the land, whereof he too became seized by his own unlawful act, the right of possession descended to the heir, and he could not be divested by entry, but only by action at law. 2 Black. Com. 195*, 196*.

The deduction sought to be drawn by counsel for appellees, from this common law doctrine, in favor of the descendibility of the possessory rights of occupants, as they exist here, is not perhaps without force, reference being had to the character of the two estates. In the one case, posses-

sion was illegal, and there was *ouster ;* in the other possession is legalized, and there is no *ouster.* The occupant becomes so, without any one having ceased to be so. These differences add to the character of the title we are considering, and place it on a higher footing than that at common law. True, no lapse of time will give the occupant of any part of the public domain a perfect title as against the United States, and the possibility of a perfect title by *lapse of time* and *neglect* of the owner of the fee does not exist. The possibility of a perfect title, however, by *consent* and *act* of the owner does exist, in fact is made possible by the legislative will. Possibility of perfect title is replaced by legal right to acquire perfect title. Place the descendibility of the title of the disseizor at common law upon what ground you may, it is difficult to discover or imagine any plea for investing it with this quality, that would not equally, if not more strongly, apply to title as it exists here.

It appears to us, however, that in the absence of statutory provisions, the descendibility of such estates might be placed on other and more satisfactory grounds. Feudal reasons have disappeared, and the peace, good order and stability of society, its prosperity secured by invoking the highest endeavors of its individual members by securing to them and their descendants the fruits of their labors ; the superior claims of kindred, over strangers, founded on natural laws, are among the chief considerations upon which the laws of descent now exist. These considerations are as potent and imperative respecting the titles we are considering as they can be in the case of a fee. The common law has been adopted only in so far as it is applicable to existing conditions. Its rules, whether technical or otherwise, cannot be allowed to imperil great interests.

In the case of the *Merced Mining Co.* v. *Fremont,* 7 Cal. 325, Mr. Justice BURNETT says : "The sentiment, that courts are bound to take judicial notice of the political and social condition of the country which they judicially rule, is as just as it is concise and appropriate ; and courts knowing the social and political condition of the country, are equally

bound to apply the rules of law and the principles of enlarged reason to the new circumstances of a people."

Where statutory provisions are wanting, we think these considerations would afford safe and tenable ground upon which the descendibility of these titles might be maintained and vindicated. *Beckett* v. *Silover*, 7 Cal. 229 ; *Merritt* v. *Judd*, 14 id. 63 ; *Hughes* v. *Divillin*, 23 id. 507 ; *Hale & Norcross G. & S. Mining Co.* v. *Story County*, 1 Nev. 106; *Coy* v. *Coy*, 15 Minn. 119.

We prefer, however, to rest our decision on statutory provisions. The condition of titles before described made title by occupancy of paramount importance, and its legal status claimed the attention of our first legislature. It was a labor of the first necessity, and under the ample grant of legislative power, extending to all rightful subjects of legislation, we are not surprised to find all laws upon the subject, tending to one end, and showing a clear purpose to put the *bona fide* occupant of the public domain, as far as lay in its power, upon a footing of security.

Among the first acts passed was "an act declaratory of the rights of occupants of the public domain, except as against the United States." After recognizing the paramount right of the United States, the first section declares, "that as between all the good citizens now residing in, or who may hereafter come to reside in this Territory, and as between them, or any of them, and others having or claiming, or now or hereafter pretending to have or claim, any right to occupy, possess and enjoy any portion of the public domain situate within the boundaries of this Territory, and as between each and every of them and all other persons, associations, corporations and powers, except the government of the United States, the right as the same may exist under the local laws to occupy, possess and enjoy any tract or portion thereof, shall be respected in law and equity in all the courts and tribunals of this Territory as a chattel real *possessing the legal character of real estate.*"

The closing phrase of this section is remarkable, except in the light of the end which the legislature had in view.

The legal character of a chattel real at common law was personalty, and had the phrase "possessing the legal character of real estate" been omitted, title by occupancy would have been personalty under this act; been dealt with as such, and descended as such. This phrase clothes it with the different and higher character of real estate. That such was the design and intention of the legislature, we find abundant evidence in other provisions of this and other statutes

The next section provides for a declaration in cases of original occupancy and for transfer *by deed*, duly acknowledged by some officer authorized to take acknowledgments of deeds, in cases of purchase, and for their registry in the office of the recorder of the proper county.

The next section declares that the owner of every such claim shall have a transferable interest which may be sold on execution. In the form of declaration prescribed by the 5th section, the occupant claims the lands described "together with all and singular the hereditaments and appurtenances thereunto belonging or in any wise appertaining," and the record was to be received in evidence in all legal and equitable proceedings. It may be said generally that they passed all the laws usual in the older States, for the regulation of landed property held in fee, and brought title by occupancy within their meaning, either by express provision, or by a general law declaring that in the construction of statutes, the words "land or lands," and the words "real estate," shall be construed to include lands, tenements and hereditaments and *all right thereto* and *all interest therein*. 1 Sess. Laws, 107.

This brought title by occupancy within the meaning and provisions of the acts "concerning conveyances" of real estate, registration, partition, fraudulent conveyances, etc. The occupant could maintain trespass *quare clausum fregit*, ejectment, and forcible entry and detainer for injuries done to the possession. These are all actions applicable only to real estate, and we see, as we cannot but see,

a clear purpose upon the part of the legislature to raise title by occupancy to the dignity of real estate, and to surround its tenure with all the safeguards, its transfer with all the formalities, and its enjoyment with all the securities of a fee simple title.

Thus, upon the adjournment of the first legislature, except as against the United States, and subject to be defeated by abandonment, the *bona fide* occupant held his lands by a tenure as secure against attack, intrusion and disseizin, as the owner of the fee at common law; and with the exceptions named, had a title good against all the world. Such an occupancy is neither correctly nor justly characterized as a "mere naked possession."

A term which implies a purely physical possession, which supposes no law, which is independent of all law, and such as existed prior to all law; such a possession disappeared upon the death of the possessor, because it existed only in a physical sense. But we are not dealing with any such occupancy. By virtue of the legislation named, occupancy became an investive act, the law operated to give this effect to the fact. It was the commencement of legal landed rights. It invested the occupant with a tenure, assertable and defensible in mode and manner, as the highest estate known to the common law. It was not, therefore, a mere "naked possession," but as contradistinguished therefrom a legal possession, under the sanction, recognition and protection of the law.

Having thus shown the general course of legislation, and its manifest purpose, evidenced in so many ways to set its seal upon occupancy as real estate, we have smoothed our path to the end in controversy.

*Real estate* is a leading term in this inquiry, and it is necessary to keep in view its signification, to wit, "something that may be held by tenure, or will pass to the *heir* of the possessor at his death instead of his *executor*, including lands, tenements and hereditaments, whether the latter be corporeal or incorporeal." Bouv. Law Dict., title "Real Property."

Having placed title by occupancy upon the footing seen, it would have been strange, indeed, if the legislature had made no provision suitable to the legal character given it, for its disposition upon the demise of the occupant. We find in the Laws of 1861, p. 246, the following provision: "Whenever any person having title to any real estate, or property having the nature or character of real estate, * * * * * shall die intestate as to such real estate, it shall descend * * * * * in the following course and manner."

Whether we interpret the words "real estate," by the definition fixed by statute already alluded to, or with reference to its nature or the legal character with which title by occupancy had been invested, under either view or all, we can, we think, without subtlety or forced construction, hold such an estate inheritable.

We are unable to see any force in the argument that it descends as personalty. If it descends at all it is in and with the legal character which the law has given it.

There is nothing in the law which obliterates its legal character upon demise, nor is there any thing that invests it with another and different character upon transmission to the heir. Upon the death of Richardson, therefore, his heirs became co-tenants with Hawley H. Gillett of the premises in question. They were tenants in common, for a joint tenancy can only be created by purchase, or act of the parties, and not by descent or act of the law. 1 Wash. R. P. 643, 645.

Soon after Hawley H. Gillett made a sale and conveyance of an one-half interest in the premises to his brother George, and in August, 1865, the two received a deed from the probate judge therefor.

Hawley H. Gillett had no power or authority to sell the interest of Richardson's heirs; and had his power been full and complete, the deed which he executed conveyed only his individual interest. He describes himself as surviving partner of the late firm of Richardson & Gillett in the body of the deed, and as an addition to his signature

thereto. Farther than this, no mention is made of Richardson or his heirs, or of his or their estate. On the other hand, the deed, in words, conveys the right, title and interest of Hawley H. Gillett in and to the premises. One having a power to sell lands and also an interest in his own right in the same lands, his deed of the lands making no mention of the power, will convey only his own interest. If all the words of a deed or will can have an effect given to them, and are operative upon property or rights, without being taken as the execution of a power, they will not be the execution of such power. Perry on Trusts, § 511 c; 2 Wash. R. P. 665, § 33, and cases cited.

The bill was framed and the trial below proceeded upon the theory that the deed in question conveyed the interest of Richardson's heirs, while the decree implies that it conveyed the moiety of their interest. Both views are erroneous. The effect of the deed of Hawley H. Gillett to his brother George was to sever his relations as co-tenant with the heirs of Richardson and to substitute his grantee. Subsequently they acquired the fee by deed from the probate judge, who had entered the town site in trust, etc. This brings us to a consideration of the relations which George Gillett sustains to this case.

It is a well-settled rule governing the trust relation which co-tenants sustain, that if one tenant acquire an outstanding title, he will be considered as holding it in trust for his co-tenants, subject to the right of being reimbursed *pro rata* his moneys paid out in acquiring the title. 1 Wash. 686, § 14.

George Gillett was a co-tenant, and acquired an outstanding title, but should he be held to respond to the claim of his co-tenants, under the foregoing rule, under all the circumstances of the case? Here was a co-tenancy; the fee was in the United States; it had been entered in trust for the *bona fide* owners and occupants; the mode in which they should proceed to perfect their title was prescribed; it was necessary that the occupant should take

certain preliminary steps to that end ; he must file his application within ninety days stating, among other things, the specific interest or estate that he claimed, and make this proof of occupancy. The heirs of Richardson took no steps toward perfecting their title to this interest in this property under the law. George Gillett, on the other hand, complied with the statute and perfected his title to his one-half interest; this much was his right to do under the law. Had he acquired the title to the half belonging to the heirs as well, equity undoubtedly would have held him as trustee as to that half for the heirs of Richardson. But he had no right or authority under the law to apply for the entire lot in his own right, and we cannot say that it was his duty to have voluntarily constituted himself their agent and applied in their name. Can it be said, under such circumstances, that he comes within the rule touching co-tenants as trustees in case of the acquisition of an outstanding title ? We think not. The heirs of Richardson having failed to take any steps toward perfecting their title, have no legal or equitable claim to participate in the title acquired by George Gillett. It would reduce his half interest to a quarter interest by reason of the neglect of the parties participating in the fruits of his greater diligence and care. It would be in all cases to reduce the half interest of the co-tenant to a quarter interest where one perfected his title, and the other neglected it. Neither can he be called upon to respond for rents and profits in the absence of any allegation in the bill that he has received more than his proportionate share. He sustains no relation to the complainants that entitle them to a decree against him, and the bill as to him must be dismissed, unless it be so amended as to make him a proper party. The relations which Hawley H. Gillett sustains to this case are altogether different. He was the surviving partner of Richardson, engaged in and by the law intrusted with the settlement of the partnership estate. The bill alleges that these premises were purchased with partnership funds. It is not denied by the answer,

which, on the other hand, admits the improvements thereon
to have been made by partnership funds, and avers that
the surviving partner dealt with the lots as part of the
partnership assets.   Belonging to the partnership, equity
would, if necessary, have applied it to the payment of the
partnership debts, or enforced against it the lien of the sur-
vivor, for any balance due him upon settlement of the part-
nership accounts. · Parsons on Part. 371*, 372*, 374*, 441*,
note *p.*

The death of a partner invests the surviving partner with
the exclusive right of possession and management of the
whole partnership property and business, for the purpose
of settling and closing up the same.   Parsons on Part.
440*.   It is one of the most important trust relations.
The survivors are from the death *trustees* for all concerned
in the partnership for the representatives of the deceased,
for the creditors of the firm, and for themselves.   Their
trust is to wind up the partnership matters in the best
manner possible for all interests.   Parsons on Part. 442.
How far surviving partners would be entitled to the pos-
session of partnership real estate we do not decide, but the
trust relation exists as to it as well as to the personalty.
They are held strictly and to the utmost good faith and
fair dealing, and their conduct in discharging this trust is
looked after with a jealous eye by courts of equity. Id.
If there be negligence, delay, misconduct or mistake, equity
will interfere and give proper relief. Id.   No affirmative
acts on the part of the heirs of Richardson were necessary
to create this relation; the law established it for them and
imposed the trust.   Hawley H. Gillett was perfectly cog-
nizant of the rights of Richardson's heirs in and to the
undivided one-half of this property, and, in his double rela-
tion of surviving partner and co-tenant, had possession of,
and control over it.   Whether it was his duty, under the
relation which he sustained, to have made application for
title under the town site act for the heirs of Richardson, as
their agent, it is not necessary to determine.   Having sold
and conveyed his own interest in the property, and after-

ward filed his application jointly with his grantee for the entire property, we must hold him to have acted as the agent of Richardson's heirs in making this application and to hold the property in trust for their use and benefit.

Equally under another view, we think he must be held to the same responsibility. From the death of Richardson until his deed to his brother George, he was the co-tenant of Richardson's heirs. He was in possession, and his possession was theirs as well as his own, and for their benefit so far as preserving their title thereto. 1 Wash. R. P. 656, § 7. During this period he applied to the probate judge for the title to the entire property as "surviving partner of the firm of Richardson & Gillett." For some reason, the written application was not completed. Subsequently on the 10th of July, he sold and conveyed his undivided interest in the premises to his brother George. On the same or the next day, he united in a joint application to the probate judge, under which the entire property was conveyed to them as legal owners thereof. The former uncompleted application was used, the words "surviving partner of Richardson & Gillett" being erased.

Had his first application been perfected and title acquired under it to the entire premises, clearly his relation as co-tenant would have devolved upon him the character of trustee as to one-half of the property. Can he be permitted to evade this responsibility by severing his relations as co-tenant, without notice, upon one day, and acquiring the outstanding title the next? We think not, under the circumstances of this particular case. He was at liberty to sever his relations as co-tenant by his deed to his brother George, and cannot be held, strictly speaking, to respond as in case of a co-tenant acquiring an outstanding title, but his acts constitute a fraud upon the heirs of Richardson in their results, if not in intention, of which a court of equity will not allow him to gather the fruits.

The heirs of Hawley H. Gillett took his interest in the premises charged with these equities, and must be held to hold it in trust for the complainants.

It is claimed, however, that the registry of the deed from the probate judge to Hawley H. and George Gillett was notice to the complainant, Mrs. Gaffney, of the facts which constituted the fraud, and that she is barred by the statute of limitations.

A deed duly recorded is constructive notice of its existence, and of its contents, to all persons claiming what is thereby conveyed under the same grantor by subsequent purchase or mortgage, but not to other persons. 3 Wash. R. P. 319, § 53. In the case of *Maul* v. *Rider*, 59 Penn. 167, SHARSWOOD, J., says: "That the record of a deed is constructive notice to all the world, is too broad an enunciation of the doctrine. Such record is constructive notice only to those who are bound to search for it as subsequent purchasers and mortgagees, and all others who deal with it on the credit of the title in the line of which the recorded deed belongs."

There is nothing in the registry laws in force at the time of the record of the probate judge's deed, that would authorize us to charge Mrs. Gaffney with notice of its existence or contents.

For the rents collected by Hawley H. Gillett after the death of Richardson, and prior to his own death, his estate must respond, and his administrator, Webster, is therefore a proper party.

The decree of the court below must be reversed, with leave to the complainants to amend their bill in accordance with the views expressed herein.

And, as it is possible, though we are not prepared to say this appears from the evidence, that Hawley H. Gillett may have acted through mistake, and may have paid over the proceeds of the sale to George Gillett, to the complainants in some authorized way, his representatives and heirs will have leave to file their cross bill, under which their equities, should any be made to appear, can be protected.

Each party to have leave to take further testimony, if so advised.

Decree reversed with costs.                    *Reversed.*

Wells, J.　I concur in what is said above, but, to avoid any misunderstanding, I desire to say that I see nothing in the testimony which warrants making the moneys paid by Hawley H. Gillett to the widow and personal representative of his deceased copartner, a charge on the share of the infant complainant. I think that if any payments shall be shown to have been made under such circumstances as to warrant an allowance for them, in the account of rents and profits, they must be set off against the share of the widow only.