[No. C011874. Third Dist. Mar. 8, 1995.]

FEMINIST WOMEN'S HEALTH CENTER, Plaintiff, Cross-defendant and Respondent, v.
DON BLYTHE et al., Defendants, Cross-complainants and Appellants.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I and II.

1642

## COUNSEL

Michael D. Imeld, Mike Millen, and David L. Llewellyn for Defendants, Cross-complainants and Appellants.

Dickstein & Merin, Mark E. Merin and Fred J. Hiestand for Plaintiff, Cross-defendant and Respondent.

## OPINION

**SCOTLAND, J.**—In *Feminist Women's Health Center* v. *Blythe* (1993) 17 Cal.App.4th 1543 [22 Cal.Rptr.2d 184], we addressed defendants' challenges to the trial court's issuance of a permanent injunction imposing time, place and manner restrictions on the activities of antiabortion demonstrators at plaintiff's Sacramento clinic, and to the court's order awarding plaintiff attorney fees pursuant to Code of Civil Procedure section 1021.5.[1]

Rejecting defendants' attack on the propriety and scope of the permanent injunction, we concluded: the evidence supported a finding that their conduct posed a significant threat of harm to plaintiff's patients, infringed upon the patients' right to privacy, and would continue if not enjoined permanently; the designation of a "speech free zone" in front of plaintiff's clinic and the building's private parking lot driveway was based not upon the content of defendants' speech but upon conduct of defendants which was unprotected by the First Amendment to the United States Constitution and article I, section 2 of the California Constitution; and the injunction was tailored narrowly to protect the patients' privacy interest while providing defendants with ample opportunity to communicate their antiabortion message.

Upholding the attorney fee order as to all defendants except John Walker and Operation Rescue, we concluded: the record supported the trial court's finding that plaintiff did not have a sufficient financial interest in this

[1]A joint notice of appeal was filed by all defendants. In that notice, defendants John Walker and Operation Rescue appeal only from the order awarding attorney fees. The remaining defendants appeal from both the judgment granting the permanent injunction and the order awarding attorney fees. Because Walker and Operation Rescue do not appeal from the judgment granting the permanent injunction, we need not address any contentions in their briefs relating to that judgment.

litigation to preclude an attorney fee award and that plaintiff's primary motivation in seeking the injunction was to further the public interest of protecting its patients' constitutional rights to abortion by ensuring that their access to abortion services was not restricted unlawfully; and the attorney fee award would not operate to chill the constitutional rights to freedom of speech because even the most naive person would have known defendants' conduct—obstructing access to the clinic and engaging in acts of assault and harassment to prevent women who had expressed disinterest in defendants' views from exercising the constitutional right to abortion—was not protected by the First Amendment to the United States Constitution or by article I, section 2 of the California Constitution, and because the attorney fee order did not prevent defendants from continuing to demonstrate and exercise their freedom of speech within the lawful limits set forth in the injunction.

We reversed the attorney fee order as to defaulting defendants Walker and Operation Rescue because plaintiff's complaint did not demand such attorney fees and Code of Civil Procedure section 580 precludes an award against a defaulting defendant which exceeds the relief demanded in the complaint.

The unpublished portions of our opinion rejected defendants' contentions that the trial court erred in ruling on the admissibility of certain evidence and that the court's statement of decision is inadequate.

In *Reali* v. *Feminist Women's Health Center* (1994) __ U.S. __ [129 L.Ed.2d 888, 114 S.Ct. 2776], the United States Supreme Court vacated our judgment and remanded the matter to us for further consideration in light of *Madsen* v. *Women's Health Center* (1994) 512 U.S. __ [129 L.Ed.2d 593, 114 S.Ct. 2516], which was decided after our opinion in *Feminist Women's Health Center* v. *Blythe, supra,* 17 Cal.App.4th 1543. In *Madsen*, a case involving an injunction which prohibited antiabortion protesters from demonstrating in certain places and in various ways outside a health clinic that performed abortions, the Supreme Court set forth and applied a standard for evaluating the constitutionality of content-neutral injunctions which restrict speech.

At our invitation, the parties in this case have submitted briefs addressing what effect the holding in *Madsen* has on the issues raised by defendants. Having complied with the directive of the United States Supreme Court, we conclude that application of the standard of review set forth in *Madsen* does not alter the outcome we reached in *Feminist Women's Health Center* v. *Blythe, supra,* 17 Cal.App.4th 1543. Accordingly, we shall republish our opinion therein with modifications occasioned by the Supreme Court's holdings in *Madsen*.

## FACTS AND PROCEDURAL BACKGROUND

Having undertaken " 'an independent examination of the whole record' in order to make sure 'that the judgment does not constitute a forbidden intrusion on the field of free expression,' " (*Bose Corp.* v. *Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 499-501, 507-511 [80 L.Ed.2d 502, 515-517, 521-523, 104 S.Ct. 1949]), we find that the evidence supports the judgment. Summarized in the light most favorable to the judgment, and stated in the present tense as they existed at the time of the trial court hearings in this action, the facts are as follows:

Plaintiff is a nonprofit corporation operating four medical clinics in Northern California, including one located on J Street in Sacramento (hereafter the clinic) which is the subject of the injunction in this case. The clinic is open six days a week and provides gynecological health care, birth control services, pregnancy testing and screening, sexually transmitted disease testing and screening, and abortions. The clinic is on the second floor of a medical building in which several doctors' offices and a pharmacy also are located. The front entrance of the building opens onto a sidewalk running parallel to J Street along the entire length of the building and extending from the front of the building to J Street. The back entrance opens onto a 40-space parking lot to which there is access from I Street. Signs posted in the parking lot state that it is reserved for the use of tenants of the building and their customers and that trespassers will be prosecuted under Penal Code section 602 (trespassing).

Defendants are Jay Baggett, Don Blythe, Murray Lewis, Theresa Marie Reali, John Stoos, John Walker and Operation Rescue (hereafter we shall refer to these parties collectively as defendants). According to the record, Operation Rescue is a national antiabortion group whose members are willing to risk arrest in an effort to blockade abortion clinics and make it impossible for patients to enter medical facilities where abortions are performed. There is no evidence that any of the individual defendants are members of, or affiliated with, Operation Rescue.

The clinic opened in June 1987. Defendants commenced anti-abortion demonstrations there in early 1988. Every Saturday, one or more of the defendants and others would arrive at the clinic and use various techniques in an effort to counsel patients and persuade or stop them from submitting to abortions. These techniques included picketing in front of the medical building and in the parking lot, distributing antiabortion literature both inside and outside of the medical building, blocking or impeding entrance to the building and the parking lot, hitting the hoods of cars entering the parking

lot, blocking the doors of arriving patients' vehicles in the parking lot so that patients had difficulty getting out and entering the clinic, following patients in order to give them literature even if the patients indicated they were not interested, stepping into the paths of patients as they approached the clinic, urging patients not to "kill" their babies, shouting "murder, murder, murder" at patients, and pointing cameras at them.

The antiabortion demonstrations have caused problems for patients trying to enter the clinic. As previously noted, among other things demonstrators have blocked patients at the entrance to the medical building and have refused to leave. The clinic has received telephone calls from patients in nearby phone booths complaining they were unable to enter the clinic. When clinic staff offered to help and went out to escort those patients into the building, the patients sometimes could not be found. Other patients rescheduled appointments to avoid the demonstrations and called the clinic to request escort assistance into the building. Several times, police assistance has been necessary to stop blocking of the parking lot and building entrance and other activities of the demonstrators. After the district attorney's office declined to prosecute defendants who had been arrested for trespass, the parking lot "became a sort of battleground," and patients were unable to get out of their cars or enter the building without being subjected to the conduct summarized above.

The noise made by picketing demonstrators and the confrontations and other activities initiated by defendants and others at the clinic have upset and agitated clinic patients. In some instances, patients have been reduced to tears. This heightened level of anxiety has required that abortion patients receive greater amounts of medication and has lengthened the time necessary to perform abortion procedures, thereby increasing the risks to patients. Heightened anxiety of staff members, including the doctors performing abortions, has impaired their concentration, further increasing the risks to patients.

On January 6, 1989, plaintiff obtained a temporary restraining order imposing time, place and manner restrictions on the antiabortion activities of defendants as well as their agents, servants, employees and representatives. On March 6, 1989, the court granted plaintiff's motion for a preliminary injunction.

After the temporary restraining order and preliminary injunction issued, antiabortion activities at the clinic continued, including the use of cameras, bumping into and pushing aside "escorts" hired by the clinic to assist patients in entering the building, following patients into restricted areas,

blocking cars attempting to enter the parking lot, persisting in offering literature refused by patients, blocking passage on the sidewalk in front of the medical building, and picketing in restricted areas.

Defendants John Walker and Operation Rescue did not appear, and a default judgment was entered against them. Plaintiff's application for a permanent injunction was tried against the remaining defendants, and judgment was entered in plaintiff's favor for a permanent injunction prohibiting (1) any activity within a "speech free zone" defined as a rectangle extending from the front of the medical building to three feet short of the curb on J Street and twenty feet on either side of the front door, (2) blocking ingress and egress of clinic patients and staff on the sidewalk in front of the medical building, (3) yelling or otherwise producing loud noise which interferes with clinic operations, (4) photographing or videotaping clinic patients, visitors or staff, (5) recording license plate numbers of vehicles visiting the clinic, (6) entering the medical building parking lot, (7) interfering with automobiles entering or leaving the parking lot, and (8) inducing others to do any of the above.

Following trial, plaintiff moved for an award of attorney fees pursuant to Code of Civil Procedure section 1021.5. The court awarded $99,106.98 against all defendants jointly and severally, including Walker and Operation Rescue.

## DISCUSSION

### I, II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

■ Defendants contend their conduct was not sufficiently egregious to warrant entry of a permanent injunction because their conduct did not involve unlawful violence or threats of violence. In support of their argument, defendants note that the cases upon which plaintiff relied in the trial court to support injunctive relief, *Steiner* v. *Long Beach Local No. 128* (1942) 19 Cal.2d 676 [123 P.2d 20] and *M Restaurants, Inc.* v. *San Francisco Local Joint Exec. Bd. Culinary etc. Union* (1981) 124 Cal.App.3d 666 [177 Cal.Rptr. 690], involved violence and threats of bodily harm. In defendants' view, because the evidence of their conduct is not as "extreme" as the facts which justified injunctive relief in *Steiner* and *M Restaurants*, this case does

*See footnote, *ante*, page 1641.

not come "within the sweep of the *Steiner* and *M.* [*sic*] *Restaurants* cases." The contention has no merit.

Violence or the threat of violence is not a necessary prerequisite to the issuance of an injunction. (Cf. *Madsen* v. *Women's Health Center, supra,* 512 U.S. __ [129 L.Ed.2d 593].)

In *Madsen,* which involved antiabortion demonstrators protesting outside a medical clinic that performed abortions, the trial court found: "protesters continued to impede access to the clinic by congregating on the paved portion of the street . . . leading up to the clinic, and by marching in front of the clinic's driveways. It found that as vehicles heading toward the clinic slowed to allow the protesters to move out of the way, 'sidewalk counselors' would approach and attempt to give the vehicle's occupants antiabortion literature. The number of people congregating varied from a handful to 400, and the noise varied from singing and chanting to the use of loudspeakers and bullhorns. [¶] The protests, the court found, took their toll on the clinic's patients. A clinic doctor testified that, as a result of having to run such a gauntlet to enter the clinic, the patients 'manifested a higher level of anxiety and hypertension causing those patients to need a higher level of sedation to undergo the surgical procedures, thereby increasing the risk associated with such procedures.' [Citation.] The noise produced by the protesters could be heard within the clinic, causing stress in the patients both during surgical procedures and while recuperating in the recovery rooms. And those patients who turned away because of the crowd to return at a later date, the doctor testified, increased their health risks by reason of the delay. [¶] Doctors and clinic workers, in turn, were not immune even in their homes. Petitioners picketed in front of clinic employees' residences; shouted at passersby; rang the doorbells of neighbors and provided literature identifying the particular clinic employee as a 'baby killer.' Occasionally, the protesters would confront minor children of clinic employees who were home alone. [¶] This and similar testimony led the state court to conclude that [an injunction was necessary] 'to protect the health, safety and rights of women . . . seeking access to [medical and counseling] services.'" (512 U.S.at pp. __-__ [129 L.Ed.2d at pp. 603-604].) Accordingly, the trial court enjoined the protesters from engaging in a broad array of activities, including "'congregating, picketing, patrolling, demonstrating or entering that portion of public right-of-way . . . within [36] feet of the property line of the Clinic,'" and "'singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds . . . within earshot of the patients inside the Clinic [during specified hours].'" (*Id.,* at pp. __-__ [129 L.Ed.2d at pp. 604, 610, 612].) The Supreme Court upheld the 36-foot buffer zone around the clinic's entrances and driveway as a way of assuring

access to the clinic, and approved limited noise restrictions to "ensure the health and well-being of the patients at the clinic." (*Id.*, at pp. __-__ [129 L.Ed.2d at pp. 610-611, 612].)

Here, as did the antiabortion protesters in *Madsen*, defendants engaged in conduct which not only interfered with patients' access to the clinic to avail themselves of the constitutional right to an abortion (*Planned Parenthood* v. *Casey* (1992) 505 U.S. __ [120 L.Ed.2d 674, 112 S.Ct. 2791]), but also posed the threat of a significant level of harm to the patients. Akin to the medical evidence in *Madsen*, plaintiff's medical director, Dr. Steir, testified that an abortion is a procedure requiring a great deal of concentration. Because it is done with local anesthesia, the procedure requires the cooperation of the patient. Increased anxiety of patients, as well as staff, brought on by antiabortion activities increases the risks to the patient. Dr. Steir also described problems which could arise where a patient involved in a two-day procedure fails to return to the clinic on the second day. An abortion performed after 12 weeks of pregnancy is a 2-day procedure. On the first day a "laminaria" swab is inserted to dilate the cervix. The next day the actual operation is performed. According to Dr. Steir, life-threatening complications can result if the patient does not return after the first day.

Therefore, like the conduct in *Madsen*, defendant's actions constitute an adequate basis for injunctive relief despite the lack of violence or the threat of violence.

■ Defendants also contend a permanent injunction was inappropriate because no evidence was presented suggesting that the conduct supporting the temporary restraining order and preliminary injunction would be resumed if not permanently enjoined. In support of this claim, defendants point to the lack of evidence of prohibited conduct at the clinic for more than a year before trial.

■ Because injunction is an extraordinary remedy, the remedy should not be exercised unless it is reasonably probable the acts complained of will recur. "Injunctive power is not used as punishment for past acts and is ordered against them only if there is evidence they will probably recur. . . . A court of equity will not afford an injunction to prevent in the future that which in good faith has been discontinued in the absence of any evidence that the acts are likely to be repeated in the future." (*Mallon* v. *City of Long Beach* (1958) 164 Cal.App.2d 178, 190 [330 P.2d 423], citations omitted.)

■ Defendants claim the only evidence presented of their current activities and intentions was the testimony of Jay Baggett. Baggett indicated

that, if not prohibited by the injunction, he would like to resume following patients as they approach the clinic, offering literature repeatedly despite being ignored, and telling patients they are making the wrong choice. Defendants argue this testimony does not establish what Baggett *would* do if not enjoined. They further argue Baggett actually ceased activities at the clinic because of escort conduct.

Regardless of whether Baggett's testimony established what he would do if permitted, it was reasonable for the trial court to conclude that the prohibited conduct would resume unless permanently enjoined. The subject of this dispute is so intensely divisive, and the antagonists so passionately committed to their respective positions, it is not reasonable to expect that activists on either side of the controversy would give up their convictions or cease their attempts to sway others. "Whether abortions should be legal is one of the most hotly contested issues of our day." (*Portland Fem. Women's H. Ctr.* v. *Advocates for Life* (9th Cir. 1988) 859 F.2d 681, 685.) The nature of the issue involved, plus the persistent and prolonged nature of defendants' activities at the clinic before issuance of the temporary restraining order and preliminary injunction, indicate such conduct was discontinued at least in part because of the legal prohibition. Compliance with a court order is not voluntary discontinuance of prohibited conduct. (*Phipps* v. *Saddleback Valley Unified School Dist.* (1988) 204 Cal.App.3d 1110, 1118-1119 [251 Cal.Rptr. 720].)

Even if antiabortion activities were discontinued in part because of escort conduct, this would not suggest that a permanent injunction is inappropriate. Escorts were not hired by the clinic until after the commencement of antiabortion activities. Their precise function was to assist patients in avoiding the harassing conduct of the demonstrators and to monitor compliance with the temporary restraining order and preliminary injunction. The decision whether to issue a permanent injunction should not turn on the continuation of such self-help efforts by the plaintiff.

IV

Defendants' primary challenge is to the breadth of the injunction. They contend that free speech activities cannot be excluded from the parking lot or sidewalk in front of the medical building. They further contend that use of a "speech-free zone" burdens more speech than is necessary to serve the significant government interests enunciated by the trial court and that the absence of restrictions on escort conduct makes the injunction content specific.

We first address defendants' exclusion from the parking lot. This lot is of modest size and is posted for use only by tenants of the medical building and their clients.

The First Amendment to the United States Constitution and article I, section 2 of the California Constitution protect the right of free speech. The courts of this state repeatedly have protected the exercise of free speech rights in public places as well as on private property which has taken on the attributes of public property.

In *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353], the court held that individuals cannot be prohibited from exercising free speech rights in a railway station which houses a restaurant, snack bar, cocktail lounge, and magazine stand and which is open to the general public. The court indicated: "[A] railway station is like a public street or park. Noise and commotion are characteristic of the normal operation of a railway station. The railroads seek neither privacy within nor exclusive possession of their station. They therefore cannot invoke the law of trespass against petitioners to protect those interests." (*Id.*, at p. 851.)

In *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561], the court held that union picketers cannot be excluded from a private sidewalk leading to a "large 'super-market-type' grocery store." (*Id.*, at pp. 873, 876-877.) Due to a large parking lot surrounding the store, the only other available forum was the public sidewalk between 150 and 280 feet away from the store. The court explained: "[W]hen a business establishment invites the public generally to patronize its store and in doing so to traverse a sidewalk opened for access by the public the fact of private ownership of the sidewalk does not operate to strip the members of the public of their rights to exercise First Amendment privileges on the sidewalk at or near the place of entry to the establishment." (*Id.*, at p. 878.)

Despite subsequent United States Supreme Court decisions which have taken a more restricted view of First Amendment rights on private property (see *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551 [33 L.Ed.2d 131, 92 S.Ct. 2219]; *Hudgens* v. *NLRB* (1976) 424 U.S. 507 [47 L.Ed.2d 196, 96 S.Ct. 1029]), the California Supreme Court has held by virtue of article I, section 2 of the California Constitution that free speech activities cannot be prohibited in a large private shopping mall. (*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341].) According to the *Robins* court, such malls have supplanted central business districts as the essential public forum of a community. (*Id.*, at p. 910, fn. 5.) However, in so holding, the court emphasized the size of the mall (*id.*, at pp. 902, 910-911) and cautioned: " 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment.' " (*Id.*, at p. 910.)

The present case does not involve either a shopping mall or a large retail establishment. In addition to the clinic, the medical building houses only a

few medical offices and a pharmacy. The parking lot in the rear of the building is restricted to tenants and their clients and visitors. The front of the building is less than 15 feet from the curb of the street.

In *Allred* v. *Shawley* (1991) 232 Cal.App.3d 1489 [284 Cal.Rptr. 140], the court rejected a claim by antiabortion protesters that the parking lot of a 14,000-square-foot office building with 10 tenants is a public forum. The building served mainly prearranged clients, was not fully open to the community, and did not provide services essential to all community members, such as would a mall or large grocery store. (*Id.*, at p. 1501.) In *Planned Parenthood* v. *Wilson* (1991) 234 Cal.App.3d 1662 [286 Cal.Rptr. 427], where the court reached the same conclusion, the clinic location was described as follows: "The Medical Center's six tenants exclusively offer professional and personal services to specific clientele. It is for use only by individuals with specific business purposes, such as employees, clients and prospective clients of the tenants. The small off-street parking lot is designed to provide a convenient place to park for those having direct business with Medical Center tenants. Each parking spot is labeled for use by 'tenants' and 'patients,' and there is no space for public parking in general. Unlike a large shopping mall or historically recognized public forums like parks, streets or public sidewalks, the Medical Center in no way has acquired the attributes of a public forum." (*Id.*, at pp. 1671-1672.)

Defendants contend these cases are distinguishable because neither involved a facility housing a pharmacy open to the public. However, even though the pharmacy is open to the general public, we do not view this fact as changing the basic nature of the medical building as " 'a modest retail establishment' " (*Robins* v. *Pruneyard Shopping Center*, *supra*, 23 Cal.3d at p. 910), given the size of the building and parking lot involved. (Accord, *City of Sunnyside* v. *Lopez* (1988) 50 Wn.App. 786 [751 P.2d 313, 318].) The parking lot is private property, and the restriction against antiabortion activities therein is a reasonable limitation on defendants' free speech rights.

■ The injunction also prohibits antiabortion activities within a speech-free zone encompassing a large portion of the sidewalk in front of the medical building.[2] ■ Such areas as streets, sidewalks and parks historically have been viewed as "quintessential public forums" where free speech cannot be prohibited. (*Perry Educators' Assn.* v. *Perry Local Ed. Assn.*

[2]The trial court expressly excluded from the speech-free zone a three-foot wide strip adjacent to the curb along the side of J Street, i.e., what might be considered the "sidewalk" parallel to the front of the clinic. (See Webster's Third New Internat. Dict. (1971) p. 2113; The Random House Dict. of the English Language (unabridged ed. 1966) p. 1324 [a sidewalk generally is defined as a walk along the side of a road or street].)

(1983) 460 U.S. 37, 45 [74 L.Ed.2d 794, 804, 103 S.Ct. 948]; *Chico Feminist Women's Health Center* v. *Scully* (1989) 208 Cal.App.3d 230, 244 [256 Cal.Rptr. 194].) However, an injunction may restrict speech in such a forum if the injunction's provisions are "content-neutral" and "burden no more speech than necessary to serve a significant government interest." (*Madsen* v. *Women's Health Center, supra,* 512 U.S. at p. __ [129 L.Ed.2d at p. 608].)

■ Assuming the area designated a speech-free zone is a public forum, we find the foregoing requirements satisfied in this instance. The trial court indicated the locational restriction on defendants' activity was not based on the content of their speech but on the conduct involved, i.e., the obstruction of ingress and egress by physical blocking and harassment, and on the risk of harm to the clinic's patients. This is supported by substantial evidence. A restriction against activities within a given area is content neutral, as it makes no reference to the issues or viewpoints raised. (*Madsen* v. *Women's Health Center, supra,* 512 U.S. at pp. __-__ [129 L.Ed.2d at pp. 606, 607] ["the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based"]; *Portland Fem. Women's H. Ctr.* v. *Advocates for Life, Inc., supra,* 859 F.2d at p. 686; *Bering* v. *Share* (1986) 106 Wn.2d 212 [721 P.2d 918, 925]; but see *Thomason* v. *Jernigan* (E.D.Mich. 1991) 770 F.Supp. 1195, 1201.) The injunction simply insulates the clinic's patients from close physical contact with defendants, not from the content of their speech. (Cf. *Madsen* v. *Women's Health Center, supra,* 512 U.S. at pp. __-__ [129 L.Ed.2d at pp. 610-611].)

Several significant government interests are served by exclusion from the speech-free zone: the protection of the property rights of the clinic, the health and safety of the clinic's patients, and the privacy rights of the patients. (*Madsen* v. *Women's Health Center, supra,* 512 U.S. at pp. __-__ [129 L.Ed.2d at pp. 609-610].) "[T]he combination of these governmental interests is quite sufficient to justify an appropriately tailored injunction to protect them." (*Id.,* at p. __ [129 L.Ed.2d at p. 610].)

Regarding the privacy rights of the patients, "[a]rticle I, section 1 of the California Constitution expressly makes the pursuit and obtaining of privacy an 'inalienable right.' ■ The state right of privacy protects information about a citizen's participation in a medical procedure, including abortion." (*Chico Feminist Women's Health Center* v. *Scully, supra,* 208 Cal.App.3d at p. 241.) ■ Aside from physically impeding access to the clinic, the presence of antiabortion activities directly in front of the clinic entrance can have a coercive effect on both patients and providers. Patients may be forced to seek assistance elsewhere or forgo the procedure altogether, while providers may be forced to discontinue abortion services because of continued

harassment or pressure from building owners. In either event, the ability of a woman to effectuate her abortion decision would be compromised in violation of her rights.

Furthermore, face-to-face confrontation between the protesters and the patients or staff members increases the health risks to patients. Evidence in this case established that the heightened level of anxiety engendered by such confrontations impairs the concentration of the doctors performing the abortions, increases the length of time necessary to perform the abortions, and increases the amount of medication needed by the patients. The physical hounding of the patients and staff by the protesters in the immediate proximity of the entrance to the clinic disrupts the atmosphere necessary for rendering safe and efficacious health care and increases the risk of medical complications. The exclusion of defendants from the 20-foot zone provides the clinic's patients with a modicum of protection from defendants' harassing conduct, as well as ensuring access, without burdening more speech than is necessary to protect the aforementioned government interests. (*Madsen* v. *Women's Health Center, supra*, 512 U.S. at pp. __-__ [129 L.Ed.2d at pp. 610-611] [a "36-foot buffer zone around the clinic entrances and driveway burdens no more speech than necessary to accomplish the governmental interest at stake"]; cf. *Krishna Society* v. *Lee* (1992) 505 U.S. __, __ [120 L.Ed.2d 541, 553, 112 S.Ct. 2701], [". . . face-to-face solicitation presents risks of duress that are an appropriate target of regulation"].)

Defendants are not prevented from speaking to patients who are in the speech-free zone; defendants simply are precluded from entering the zone themselves. Moreover, defendants are not barred from the front of the building where the zone is located. A three-foot strip near the curb and parallel to the speech-free zone is available for their use. Any patient approaching the clinic from the front would be required to go either directly past, or within a few feet of, defendants. "While the court could possibly achieve its goal with a narrower free zone, we decline to entertain quibbling over a few feet." (*Portland Fem. Women's H. Ctr.* v. *Advocates for Life, supra*, 859 F.2d at p. 686; cf. *Madsen* v. *Women's Health Center, supra*, 512 U.S. at pp. __-__ [129 L.Ed.2d at pp. 610-611] [upholding a 36-foot buffer zone].)

Defendants have not been exiled to a nonaccessible location. As previously indicated, patients approaching the front of the clinic must pass areas where defendants are permitted. Those approaching the rear of the clinic through the parking lot must pass the parking lot entrance, where defendants also are permitted. Defendants are allowed to protest and carry signs in plain view of those entering or within the clinic, are not precluded from distributing their materials to anyone willing to accept them, and may approach

patients on public property outside the 20-foot speech-free zone so long as they do not assault the patients or attempt to block their access to the clinic. The restriction merely prohibits defendants from getting in the way of someone trying to avoid a confrontation.

■ Defendants claim there is no evidence they obstructed access on the sidewalk. It follows, they argue, the speech-free zone located there burdens more speech than is necessary to serve the government's interest in securing access. Their argument is unavailing.

First, there is substantial evidence that defendants, as well as other protesters, interfered with the sidewalk access to the clinic by means of physical obstruction as well as by the use of physical intimidation and harassment which served to constructively block access. Second, defendants overlook that the injunction is designed to preserve not only access to the clinic, but also to safeguard the health and safety of patients obtaining abortions. The 20-foot zone protects these patients from the defendants' anxiety-inducing physical confrontations, which increase the risk of medical complications. Contrary to defendants' assertion, the evidence established that the emotional distress suffered by patients resulted not from the content of the protesters' message, but from physical conduct of the protesters. The trial court appropriately enjoined the defendants' presence within the 20-foot zone, but protected defendants' speech rights by carving out the parallel 3-foot zone on the sidewalk, within which defendants were free to speak to the patients, protest, picket and otherwise convey their message.

■ Defendants also assert that the injunction does not pass constitutional muster because the trial court did not first try a narrower injunction before creating a speech-free zone. We disagree. Although *Madsen* v. *Women's Health Center, supra*, states the previous ineffectiveness of a less restrictive injunction "may be taken into consideration" in evaluating the constitutionality of a broader order which includes a buffer zone (512 U.S. at p. __ [129 L.Ed.2d at p. 611]), nothing in *Madsen* mandates that a less restrictive prior injunction is a necessary prerequisite. The failure of a less restrictive order is simply a factor which "may" be considered in determining whether a content-neutral injunction burdens no more speech than necessary to accomplish a legitimate governmental interest. (*Ibid.*)[3]

Here, the 20-foot speech-free zone, which is less restrictive than the buffer zone upheld in *Madsen* v. *Women's Health Center, supra*, was warranted in

---

[3]Defendants' reliance on *Pro-Choice Network* v. *Schenck* (2d Cir. 1994) 34 F.3d 130 is misplaced because that opinion "was withdrawn from the bound volume pending a rehearing en banc poll." (34 F.3d 131-147.)

light of defendants' actions, including their violation of the temporary restraining order. The zone burdens the least speech necessary to protect access to the clinic and to reduce health risks to the patients by protecting the patients and medical staff from physical confrontations as they enter the clinic. The small size of the zone and defendants' ability to congregate in the parallel three-foot strip ensures that anyone entering the clinic will hear the protesters' message and see any signs or pictures displayed by the demonstrators.

 Lastly, defendants contend that creation of a speech-free zone, in combination with the coercive conduct of clinic escorts, eliminates any reasonable alternatives for communication and, therefore, is an unduly burdensome restriction on defendants' free speech rights. In support of this claim, defendants cite the testimony of Jay Baggett that escorts used such techniques as screening patients with umbrellas or signs, placing themselves between demonstrators and patients, taking prolife materials away from patients, using chants to drown out prolife messages, and intimidating demonstrators. However, much of this testimony conflicted with that of plaintiff's director of education, who indicated escorts were advised not to surround patients and were instructed to tell patients they could accept literature from anti-abortion activists. It also conflicted with the testimony of plaintiff's escort coordinator who indicated she never tried to drown out anti-abortionists or block them from patients. Implicit in the trial court's conclusion that reasonable alternatives were available is a finding that escort conduct did not interfere with these alternatives. This finding is supported by substantial evidence.

## V

 In a related argument, defendants contend the trial court erred in sustaining plaintiff's demurrers to the First Amendment claim in defendants' cross-complaint. They assert that the conduct of plaintiff's escorts violated defendants' right to disseminate antiabortion information and the patients' right to receive that information.

Free speech provisions of the state and federal Constitutions protect citizens from restrictions imposed by governmental action. Free speech concerns may be raised as a shield against injunctive relief only because the effectuation of such relief entails government action. (Accord, *Bering* v. *Share, supra*, 721 P.2d at p. 925.) However, the same concerns cannot be used as a sword to obtain relief against a private party. Thus, defendants' contention has no merit.

Furthermore, even assuming defendants have standing to assert free speech rights of clinic patients and could state a claim for their deprivation,

the trial court implicitly found that escort conduct did not interfere with defendants' ability to communicate their message. Defendants do not suggest the dismissal of their First Amendment claim precluded admission of evidence of escort conduct. On the contrary, considerable testimony was received regarding such conduct.[4]

## VI

 Lastly, defendants challenge the award of attorney fees made pursuant to Code of Civil Procedure section 1021.5 (hereafter section 1021.5). They contend the award is not supported by the record and will have a chilling effect on their exercise of free speech rights protected by the First Amendment to the United States Constitution and article I, section 2 of the California Constitution.

 Section 1021.5 codifies the "private attorney general" doctrine for awarding attorney fees. This doctrine "rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].)

Where, as here, a plaintiff's action has not produced a monetary recovery, an award of attorney fees is proper under section 1021.5 if (1) the action has resulted in enforcement of an important right affecting the public interest, (2) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, and (3) the necessity and financial burden of private enforcement makes the award appropriate. (§ 1021.5; *Woodland Hills Residents Assn., Inc.* v. *City Council*, *supra*, 23 Cal.3d at pp. 934-935.)

 The trial court found these elements were met. Its determination may not be disturbed on appeal absent a showing that the court abused its discretion in awarding attorney fees, i.e., the record establishes there is no reasonable basis for the award. (*Westside Community for Independent Living, Inc.* v. *Obledo* (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365]; *Committee to Defend Reproductive Rights* v. *A Free Pregnancy Center* (1991) 229 Cal.App.3d 633, 645 [280 Cal.Rptr. 329].) "The

---

[4]We will not consider defendants' vague allusion to an Unruh Civil Rights Act violation (Civ. Code, § 51 et seq.) arising from use of the speech-free zone. No such claim was raised in, or adjudicated by, the trial court.

pertinent question is whether the grounds given by the court for its [grant] of an award are consistent with the substantive law of section 1021.5 and, if so, whether their application to the facts of this case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute." (*City of Sacramento* v. *Drew* (1989) 207 Cal.App.3d 1287, 1298 [255 Cal.Rptr. 704].)

Defendants do not dispute that this action resulted in the enforcement of an important right affecting the public interest and that a significant benefit has been conferred on the general public or a large class of persons. (Cf. *Planned Parenthood* v. *Aakhus* (1993) 14 Cal.App.4th 162, 170-172 [17 Cal.Rptr.2d 510].) Moreover, they do not dispute the necessity of private enforcement. Rather, defendants contend the financial burden of private enforcement in this instance does not warrant an award of attorney fees.

The "financial burden" criterion of section 1021.5 is met "when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake in the matter.' " (*County of Inyo* v. *City of Los Angeles* (1978) 78 Cal.App.3d 82, 89 [144 Cal.Rptr. 71], quoted with approval in *Woodland Hills Residents Assn., Inc.* v. *City Council, supra,* 23 Cal.3d at p. 941.) This requirement "focuses not on [a plaintiff's] abstract personal stake, but on the financial incentives and burdens related to bringing suit. Indeed, in the absence of some concrete personal interest in the issue being litigated, the putative plaintiff would lack standing to bring an action." (*Press* v. *Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 321, fn. 11 [193 Cal.Rptr. 900, 667 P.2d 704].)

Defendants claim plaintiff had a sufficient financial interest in this litigation to preclude an award of attorney fees under section 1021.5. They argue the evidence "indicated that [plaintiff] took in $2.4 million from provision of medical services, most of which came from the Sacramento Clinic. . . . [¶] . . . Thus, the clinic receives a substantial benefit from funds collected for abortions. All the major [A]merican automakers have sustained recent losses, but their lawsuite [*sic*] are still brought and defended for financial reasons. The same rationale applied to plaintiff." The contention has no merit.

First, defendants overstate the financial benefit plaintiff receives from the medical services it provides.[5] The trial court found plaintiff's year-end surplus of revenues over liabilities for all of its clinics combined together amounted to only $11,914 in 1988, $15,000 in 1989 and $30,353 in 1990. In

---

[5]The dissent also exaggerates this factor.

other words, the financial burden of litigation exceeded plaintiff's net income for a three-year period. Moreover, plaintiff is a nonprofit corporation operating four medical clinics in northern California, and its surpluses are used to subsidize its failing clinics, not to provide dividends for shareholders.

Second, the record establishes that plaintiff's primary motive in pursuing this action was not to protect its personal financial interest, but was to ensure its ability to continue providing medical and abortion services to women. Plaintiff did not seek to recover lost revenues; it sought relief in a representative capacity on behalf of women attempting to obtain abortion services at its clinic. Because defendants' actions were directed at preventing women from obtaining abortions by obstructing them from getting out of their cars, by impeding their progress toward the clinic, and by blocking or otherwise interfering with the entrances to the clinic and the parking lot, plaintiff sought an injunction to protect its patients' right to abortion by ensuring that their access to abortion was not restricted unlawfully.[6]

Therefore, this is not a case of a litigant which is motivated solely by its own pecuniary interests and only coincidentally protects the public interest. (See *Angelheart* v. *City of Burbank* (1991) 232 Cal.App.3d 460, 470 [285 Cal.Rptr. 463]; *Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 114 [212 Cal.Rptr. 485].) As stated in *Planned Parenthood* v. *Aakhus, supra*, a factually similar case which upheld an award of attorney fees under section 1021.5, "[t]he interests of [plaintiff] and its clients, rendering and receiving reproductive medical care, are mutual and inseparable. This action was brought to protect both [plaintiff] and its patrons; consequently, it cannot be exclusively characterized as a self-serving, private dispute commenced by [plaintiff] to protect its own pocketbook." (*Planned Parenthood* v. *Aakhus, supra*, 14 Cal.App.4th at p. 173.)

Because there is a reasonable basis in the record for the trial court's determination on the "financial burden" criterion, the court did not abuse its discretion in ordering defendants Jay Baggett, Don Blythe, Murray Lewis,

---

[6]Claiming "the injunctive decree hardly represents a 'ringing declaration' of the right of women to an abortion" (dis. opn., *post*, at p. 1677), the dissent views the matter as nothing more than a business owner's enforcement of its right to the beneficial use of its business premises. Noting that defendant's activities threatened plaintiff's ability to meet its operating expenses, the dissent concludes plaintiff merely was defending its very existence. However, plaintiff was not defending its existence solely for a profit motive. Where an abortion provider is forced, directly or indirectly, to discontinue abortion services because of continued harassment, the ability of a woman to effectuate her abortion decision is compromised in violation of her rights. Without access to an abortion, the right to abortion is illusory. Plaintiff recognized this and explicitly sought injunctive relief to ensure that its patients had the continuing ability to obtain medical and abortion services.

Theresa Marie Reali, and John Stoos to pay plaintiff's attorney fees pursuant to section 1021.5.

There is no merit in these defendants' contention that the attorney fee award should not be assessed against them because they are private individuals. Their status as private parties does not preclude an award of attorney fees. (*Planned Parenthood* v. *Aakhus, supra,* 14 Cal.App.4th at p. 175; *County of Fresno* v. *Lehman* (1991) 229 Cal.App.3d 340, 349 [280 Cal.Rptr. 310]; *Braude* v. *Automobile Club of Southern Cal.* (1986) 178 Cal.App.3d 994, 1011 [223 Cal.Rptr. 914]; *Franzblau* v. *Monardo* (1980) 108 Cal.App.3d 522, 529-530 [166 Cal.Rptr. 610].)

■ Defendants' claim that an award of attorney fees would operate to chill their rights to free speech also is unavailing because, as we shall explain, defendants' conduct unquestionably exceeded the protection afforded by the First Amendment to the United States Constitution and by article I, section 2 of the California Constitution, and interfered with the exercise by others of the constitutional right to abortion. (*Planned Parenthood* v. *Wilson, supra,* 234 Cal.App.3d at pp. 1670-1674; *Allred* v. *Shawley, supra,* 232 Cal.App.3d at pp. 1501-1505; see also *Planned Parenthood* v. *Aakhus, supra,* 14 Cal.App.4th at p. 175; *Chico Fem. Women's Hlth. Cr.* v. *Butte Glenn Med. S.* (E.D.Cal. 1983) 557 F.Supp. 1190, 1202-1204.) " '[T]he First Amendment does not offer a sanctuary for violators. The same constitution that protects the defendants' right to free speech, also protects [plaintiff's] right to abortion services and the patients' rights to receive those services.' . . ." (*Northeast Women's Center, Inc.* v. *McMonagle* (3d Cir. 1989) 868 F.2d 1342, 1349, citation omitted.)

As discussed previously, defendants obstructed access to the medical building and parking lot. "[B]locking access to public and private buildings has never been upheld as a proper method of communication in an orderly society." (*N.Y. State Nat. Organization for Women* v. *Terry* (2d Cir. 1989) 886 F.2d 1339, 1364.) Defendants also attempted to prevent clients from getting out of their cars by standing in front of car doors. At other times, defendants would position themselves so that when a patient got out of her car she was pinned between her car and the adjacent vehicle. Once a patient was able to leave her vehicle, defendants' efforts to frustrate the patient's attempt to get to the clinic continued. After patients indicated a lack of interest in the demonstrators' views and expressed a wish to be left alone, defendants continued to thrust literature at them, yell at the patients, and even chase some of them down the sidewalk. On one occasion, defendant Baggett thrust a sign in a patient's face and would have hit her in the head if she had not moved out of the way. On another occasion, defendant Reali,

who was inside the building, chased a tearful woman and thrust antiabortion literature at her. Furthermore, defendant Blythe assaulted escorts who were attempting to assist women in gaining access to the clinic.

Plaintiff sought the injunction due to this type of conduct. According to plaintiff's executive director and the clinic administrator, although the picketing had been going on for a year, court action was not pursued until defendants aggressively harassed women seeking abortion services and actually came into the building. After the temporary restraining order issued, and again after the preliminary injunction was granted, plaintiff attempted to settle this matter. Plaintiff offered to stipulate to making the injunction permanent so as to avoid the necessity and cost of trial and, in return, to modify the injunction to make it less objectionable to defendants. When plaintiff's efforts were unsuccessful, the matter went to trial. The relief granted in the permanent injunction was not significantly different than that granted in the preliminary injunction, including the exclusion of defendants from the parking lot.

Consequently, the attorney fees incurred by plaintiff were necessitated by defendants' refusal to limit their conduct to that protected by the First Amendment to the United States Constitution and by article I, section 2 of the California Constitution. If defendants had not engaged in unprotected conduct, plaintiff would not have initiated this action and, thus, would not have incurred the attorney fees in question.

The attorney fee award does not operate to chill defendants' rights to freedom of speech because it does not prevent them from continuing to demonstrate and exercise their free speech rights within the lawful limits set forth in the injunction. No legitimate claim can be made that the attorney fee award punishes defendants after the fact for conduct they did not know was beyond the protected realm of their freedom of speech and, therefore, defendants and others will be inhibited in the future exercise of their freedom of speech for fear of being "penalized" again. Even the most naive person would have known defendants' conduct—obstructing access to a lawful enterprise and engaging in acts of assault and harassment to prevent women who had expressed disinterest in defendants' views from exercising the constitutional right to abortion—is not absolved by invoking the protections afforded by the First Amendment and California Constitution article I, section 2. ■■■ When a person oversteps the bounds of protected speech, civil and criminal liability may attach. (*Northeast Women's Center, Inc.* v. *McMonagle, supra,* 868 F.2d at pp. 1348-1350; cf. *Radich* v. *Goode* (3d Cir. 1989) 886 F.2d 1391, 1398.)

■■■ The dissent asserts the attorney fee award is infirm because the trial court "[did] not parse out the legal from the illegal conduct or fix the

responsibility individually for illegal acts and the proportionate impact of illegal conduct on plaintiff's litigation costs." (Dis. opn., *post*, at p. 1682.)

However, defendants do not attack the attorney fee order on this basis. Moreover, *NAACP* v. *Claiborne Hardware Co.* (1982) 458 U.S. 886 [73 L.Ed.2d 1215, 102 S.Ct. 3409], upon which the dissent relies, is inapposite. In that case, Black persons seeking to achieve racial justice were sued in state court for acting in concert to boycott a number of White merchants. The boycott generally was peaceful and orderly. No arrests were made and no complaints were received in connection with the defendants' picketing. However, some threats of violence and acts of violence were committed by some of the defendants against people not honoring the boycott. (*Id.*, at pp. 903-905 [73 L.Ed.2d at pp. 1229-1231].) Even though only some of the defendants had resorted to violence and unlawful conduct, the Mississippi Supreme Court concluded the entire boycott was unlawful and upheld the trial court's imposition of liability for the merchant's business losses on the ground the defendants maliciously interfered with the merchants' business. (*Id.*, at pp. 894, 895 [73 L.Ed.2d at p. 1224].) In addition, the defendants were enjoined from picketing the merchants' premises and from persuading people to withhold their patronage from the merchants' businesses. (*Id.*, at p. 893 [73 L.Ed.2d at p. 1224].) The United States Supreme Court reversed the judgment, holding the First Amendment protected the nonviolent elements of the boycott (*id.*, at pp. 915, 934 [73 L.Ed.2d at pp. 1237, 1249]), the state could not prohibit peaceful political activity (*id.*, at p. 913 [73 L.Ed.2d at p. 1236]), and the state court could not hold all the boycott participants liable for all the merchants' damages merely because some of the participants engaged in violence, especially where it was not established that all of the damages were attributable to the unprotected, violent activity (*id.*, at pp. 921-923 [73 L.Ed.2d at pp. 1241-1242]). The court stated: "While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity." (*Id.*, at p. 918 [73 L.Ed.2d at p. 1240].) Hence, only those defendants who engaged in unprotected, violent conduct were responsible for the damages and only to the extent the damages were caused by their unlawful conduct. (*Id.*, at pp. 926, 933 [73 L.Ed.2d at p. 1244, 1249].)

Here, unlike in *NAACP* v. *Claiborne Hardware Co.*, *supra*, plaintiff commenced this action to enjoin defendants' unlawful and unprotected conduct, the injunction granted was proper, and all of the defendants engaged in the unprotected activities which caused plaintiff to seek the injunction. Because plaintiff was compelled to retain counsel to secure an order enjoining

*unprotected conduct engaged in by all of the defendants*, it is proper to hold all of them accountable for plaintiff's attorney fees.[7]

The dissent offers yet another basis, not advanced by defendants, to overturn the attorney fee award. Stating that union members picketing their employers' businesses frequently have been enjoined from related conduct which unduly infringes on the employers' property rights, the dissent suggests there are no cases which have required individual union members to pay attorney fees incurred by the businesses in obtaining the injunctions. Implying there are no such cases because the picketers were exercising their First Amendment rights, the dissent asserts, by analogy, that attorney fees should not be awarded in the present case. (Dis. opn., *post*, at p. 1680.) We are unpersuaded. Ordinarily, attorney fees pursuant to section 1021.5 would not be warranted in an action to enjoin certain conduct of union members picketing their employer's business, even if the picketers' conduct included actions unprotected by the First Amendment. This is so because (1) injunctions obtained by employers do not necessarily confer a significant benefit upon the general public or a large class of persons, and (2) if employers champion only their individual property rights, the financial burden of litigation would not outweigh their personal stake in the matter. Hence, the analogy invoked by the dissent is inapposite.

 In their reply brief, defendants argue the attorney fee award should be reversed due to the fact that some of the litigation expenses were incurred by plaintiff's seeking an impermissible line-of-sight restriction and because defendants believed they had a constitutional right to conduct their activities in the parking lot and on the sidewalk. Defendants note that *Allred* v. *Shawley*, *supra*, 232 Cal.App.3d 1489 and *Planned Parenthood* v. *Wilson*, *supra*, 234 Cal.App.3d 1662, which held that parking lots similar to plaintiff's are not public or quasi-public forums, were not decided until after the

---

[7]We recognize that a trial court has discretion to apportion a section 1021.5 attorney fee award based upon the relative culpability of the defendants. (*Californians for Responsible Toxics Management* v. *Kizer* (1989) 211 Cal.App.3d 961, 976 [259 Cal.Rptr. 599]; *Washburn* v. *City of Berkeley* (1987) 195 Cal.App.3d 578, 592-593 [240 Cal.Rptr. 784]; *Sundance* v. *Municipal Court* (1987) 192 Cal.App.3d 268, 272 [237 Cal.Rptr. 269].) However, in this case the trial court was not asked to apportion the attorney fee award among the defendants. Accordingly, it cannot be said the trial court abused its discretion by failing to order an apportionment. Moreover, plaintiff theorized that defendants were "acting in concert" with the other demonstrators in a concerted effort to obstruct patient access to plaintiff's abortion services. There is evidence to support such an inference. For example, evidence suggested that defendants Baggett, Blythe and Lewis exercised leadership roles in the demonstrations and that Baggett, Blythe, Lewis and Stoos welcomed the assistance of Operation Rescue. By ruling the defendants are jointly and severally liable for the attorney fee award, the trial court appears to have concluded that they were equally culpable of the unprotected conduct which gave rise to the attorney fee award and that none of them engaged in a lesser role which would have justified apportionment of the fee award.

trial in this case was completed. Thus, according to defendants, their "options were to be intimidated by fear of attorneys [*sic*] fees into abandoning what were, at the time, established constitutional rights, and stipulating to a line of sight restriction, or to risk losing their life savings."

■ Generally, points raised in a reply brief for the first time will not be considered unless good cause is shown for the failure to present them before. (*Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) Defendants have failed to establish good cause for their omission. In any event, defendants' contention is unpersuasive for two reasons.

■ First, the activities engaged in by defendants were not "at the time, established constitutional rights." Defendants cite no cases holding that private property similar to plaintiff's parking lot is a public forum which must be made available for the exercise of free speech rights. This is understandable because pertinent cases indicate the contrary. ■ The First Amendment to the United States Constitution does not give individuals an unqualified right to engage in free expression and assembly on private property. (*Lloyd Corp.* v. *Tanner, supra,* 407 U.S. at pp. 567-570, [33 L.Ed.2d at pp. 142-143]; *Hudgens* v. *NLRB, supra,* 424 U.S. at pp. 516-521 [47 L.Ed.2d at pp. 204-207].) Under limited circumstances, people are entitled to exercise First Amendment rights on private property which has assumed all of the characteristics of a municipality and has been devoted sufficiently to public use, a circumstance which plainly is not present in this case. (*Ibid.*; *Marsh* v. *Alabama* (1946) 326 U.S. 501, 506-507 [90 L.Ed. 265, 268-269, 66 S.Ct. 276].) The California Constitution is more definitive and inclusive than the First Amendment in protecting expression. (*Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d at pp. 908-909.) As noted in part IV, *ante, Robins* v. *Pruneyard Shopping Center, supra,* held that California's Constitution independently protects speech and petitioning rights reasonably exercised in large, privately owned shopping centers because such malls have supplanted central business districts as essential public forums of a community. (*Id.,* at p. 910, fn. 5.) However, the court emphasized the size of the mall (*id.,* at pp. 902, 910-911) and cautioned: " 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment.' " (*Id.,* at p. 910.) ■ In other words, *Robins* v. *Pruneyard Shopping Center, supra,* did not hold that a parking lot that is adjacent to a small medical building and has signs posted restricting its use to tenants and clients is a public forum. In fact, the decision intimated that such a modest establishment is *not* a public forum.

Accordingly, at the time of the demonstrations, there was no case law which would have led defendants to believe they had a constitutional right to

ignore the signs posted on plaintiff's parking lot—warning that the parking lot was reserved for use of tenants and customers and that trespassers would be prosecuted—and to enter onto the parking lot in an effort to convey their antiabortion message.

Moreover, even if they honestly thought the parking lot was a quasi-public forum, defendants had absolutely no basis to believe they had a constitutional right to enter the lot to interfere with the conduct of plaintiff's business and use of the property, to impede the movement of customers or business tenants, to block access, to create noisy disturbances or to harass uninterested patrons. (*In re Hoffman, supra,* 67 Cal.2d at pp. 851-852.)

 Second, the fact that plaintiff did not prevail in its attempt to increase the speech-free zone to an area within the line of sight of the front and rear entrances to the medical building does not undermine the attorney fee award. Despite defendants' request that the trial court reduce the attorney fee award based upon plaintiff's failure to prevail on the so-called "line-of-sight" restriction, the trial court declined to do so. We find no abuse of discretion. (*Sundance* v. *Municipal Court, supra,* 192 Cal.App.3d at p. 274.) The record discloses plaintiff did not avidly pursue a line-of-sight restriction. In fact, plaintiff indicated it readily would accept a 20-foot speech-free zone. In its trial brief, plaintiff even suggested the court "put the picketers where the women can see them and voluntarily approach them if interested (away from the front of the building)." Under the circumstances, the trial court reasonably could have concluded that an insignificant portion of plaintiff's attorney fees were expended in litigating a line-of-sight restriction.

 A reduced fee award is appropriate when a claimant achieves only limited success. (*Sokolow* v. *County of San Mateo* (1989) 213 Cal.App.3d 231, 249 [261 Cal.Rptr. 520].) Here, plaintiff got virtually all it asked for. Hence, the trial court did not err in awarding plaintiff full compensation for its attorney fees.[8]

 Although we shall affirm the order as to defendants Baggett, Blythe, Lewis, Reali, and Stoos, we will reverse the attorney fee award as to

___

[8]Although not controlling, federal precedent is of analogous precedential value. (*Serrano* v. *Unruh* (1982) 32 Cal.3d 621, 639, fn. 29 [186 Cal.Rptr. 754, 652 P.2d 985]; *Sokolow* v. *County of San Mateo, supra,* 213 Cal.App.3d at p. 249.) According to the United States Supreme Court, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally, this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. . . . [¶] If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount. This will be true even where the plaintiff's claims were interrelated, nonfrivolous,

defendants John Walker and Operation Rescue. They contend correctly that they may not be held liable for plaintiff's attorney fees because an award of such fees is precluded by Code of Civil Procedure section 580.

Walker and Operation Rescue did not file answers to plaintiff's complaint, and defaults were entered accordingly. Code of Civil Procedure section 580 provides: *"The relief granted to the plaintiff, if there is no answer, cannot exceed that which he or she shall have demanded in his or her complaint. . . ;* but in any other case, the court may grant the plaintiff any relief consistent with the case made by the complaint and embraced within the issue." (Italics added.)

Code of Civil Procedure section 580 repeatedly has been interpreted in accordance with its plain language. A trial court has no jurisdiction to grant a plaintiff more relief against a defaulting defendant than is asked for in the complaint. (*In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1166-1167 [276 Cal.Rptr. 290, 801 P.2d 1041, 5 A.L.R.5th 1156]; *Greenup* v. *Rodman* (1986) 42 Cal.3d 822, 826 [231 Cal.Rptr. 220, 726 P.2d 1295]; *Becker* v. *S.P.V. Construction Co.* (1980) 27 Cal.3d 489, 493 [165 Cal.Rptr. 825, 612 P.2d 915].)

Plaintiff's complaint does not contain any allegations concerning attorney fees, nor does it demand such fees. If plaintiff believed it was entitled by statute to attorney fees, it had to allege that fact in its complaint and demand the fees in the prayer in order to obtain such relief against any defaulting defendants. (*Becker* v. *S.P.V. Construction Co., supra,* 27 Cal.3d at p. 495; *Wiley* v. *Rhodes* (1990) 223 Cal.App.3d 1470, 1474 [273 Cal.Rptr. 279].) It also is noteworthy that plaintiff failed to request attorney fees as costs in its requests to enter default. (*Wiley* v. *Rhodes, supra,* at p. 1474, fn. 5.)

Plaintiff contends the award was proper because a request for attorney fees under section 1021.5 need not be made until after the judgment is final. Ordinarily, this is true. (*Stebbins* v. *Gonzales* (1992) 3 Cal.App.4th 1138, 1146 [5 Cal.Rptr.2d 88]; *Angelheart* v. *City of Burbank, supra,* 232 Cal.App.3d at p. 466; *Citizens Against Rent Control* v. *City of Berkeley* (1986) 181 Cal.App.3d 213, 226-227 [226 Cal.Rptr. 265]; see also *Washburn* v. *City of Berkeley, supra,* 195 Cal.App.3d at p. 583.) However, the aforesaid cases do not involve defendants against whom defaults were entered. Hence,

and raised in good faith. . . . [T]he most critical factor is the degree of success obtained." (*Hensley* v. *Eckerhart* (1983) 461 U.S. 424, 435-436 [76 L.Ed.2d 40, 52, 103 S.Ct. 1933].) The trial court has discretion in determining the amount of a fee award. (*Id.,* at p. 437 [76 L.Ed.2d at p. 53].) As we have indicated, because plaintiff obtained "excellent results" in that it obtained the vast majority of the relief requested in its complaint, the trial court did not abuse its discretion in awarding full compensation.

those cases are governed by the latter half of Code of Civil Procedure section 580, which provides that in any case where an answer has been filed ". . . the Court may grant [the plaintiff] any relief consistent with the case made by the complaint and embraced within the issue."

Plaintiff has cited no cases holding that an award of attorney fees under section 1021.5 is proper against a defaulting defendant where a demand for such fees was not included in the complaint, and our research has disclosed none. Accordingly, plaintiff is constrained by the plain and unambiguous mandate of Code of Civil Procedure section 580: "The relief granted to the plaintiff, if there is no answer, cannot exceed that which he or she shall have demanded in his or her complaint . . . ."

Because plaintiff did not demand attorney fees in its complaint, the court did not have jurisdiction to award such fees against defendants Walker and Operation Rescue. In light of this conclusion, it is unnecessary to consider the additional challenges raised by Walker and Operation Rescue, i.e., that attorney fees may not be awarded because the judgment did not grant plaintiff any relief against them, or that they may not be held liable for fees incurred after their defaults were entered. In addition, we need not address Operation Rescue's challenge to service of process as a basis for reversing the attorney fee award as to Operation Rescue.

### DISPOSITION

The attorney fee order is reversed as to defendants Walker and Operation Rescue. In all other respects, the judgment and attorney fee order are affirmed. Defendants Blythe, Lewis, Reali, Baggett and Stoos shall pay plaintiff's costs on appeal. Plaintiff shall pay the costs on appeal of defendants Walker and Operation Rescue.

Raye, J., concurred.

**PUGLIA, P. J.,** Concurring and Dissenting.—I concur in the opinion of the court to the extent it affirms the judgment granting plaintiff a permanent injunction and reverses the order awarding plaintiff attorney fees as against defendants John Walker and Operation Rescue. I dissent from the affirmance of the trial court's order awarding plaintiff attorney fees against the answering defendants.

Defendants attack the order for attorney fees on two grounds: (1) plaintiff failed to establish the financial burden of private enforcement is disproportionately greater than its stake in the litigation and (2) the award of attorney

fees in these circumstances unconstitutionally burdens defendants' rights of free speech. I agree the order is infirm on both grounds.

## I

Code of Civil Procedure section 1021.5 permits the award of attorney fees to a successful party in any action resulting in "the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

Defendants contend the plaintiff failed to establish that the financial burden of private enforcement warrants an award of attorney fees. I agree. Despite being a nonprofit organization, plaintiff's operations are significant, with four clinics in Northern California. In 1990, plaintiff had a budget of $2.4 million. Plaintiff receives its operating income from fundraising and fees for services rendered, with the greater portion coming from the latter. Fees range anywhere from $10 for minor services to $295 for an abortion. In 1988 plaintiff received $1,427,746 in fees. In 1989 the amount was $1,865,440 and in 1990 it was $2,346,891.

In 1988 the clinic saw 2,500 patients. This number grew to 3,500 in 1989, and to 6,000 in 1990. Of the 6,000 patients seen in 1990, 2,500 to 3,000 had abortions performed. Due to the conduct of picketers, attendance of patients at the clinic on Saturdays dropped by as much as 50 percent. According to Shauna Heckert, the clinic's administrator, patients "would want to change to a different facility." Because a substantial number of patients who needed the clinic's services obtained them elsewhere, plaintiff asserts the picketing caused it "a tremendous financial loss."

"The financial burden of private enforcement requirement means that an award of attorney fees under section 1021.5 . . . is only appropriate when the cost of the claimant's legal victory transcends his or her personal interest—i.e., when the necessity for pursuing the lawsuit placed a burden on the plaintiff out of proportion to his or her individual stake in the matter. [Citation.]" (*Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 30 [267 Cal.Rptr. 618].)

Plaintiff was defending its very existence as a fee-for-service entity. As plaintiff's customers fell off because of defendants' activities, plaintiff's ability to meet operating expenses was threatened. Given the size of plaintiff's operations and its annual revenue, a $99,000 legal bill is not out of proportion to plaintiff's stake in the litigation.

Although the relief granted vindicated plaintiff's interest in the controversy, the injunctive decree hardly represents a "ringing declaration" of the right of women to an abortion. (See *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158, 167 [188 Cal.Rptr. 104, 655 P.2d 306].) The decree simply ensures undisturbed access to plaintiff's facility of fee paying customers who choose to patronize plaintiff's clinic rather than some other similar facility. Its effect is no different than an injunction against union members picketing their employer's business in a labor dispute. In such cases, the injunction allows the employer to continue the beneficial use of its business premises. The fact that the injunction also frequently enables nonstriking employees who are strangers to the litigation to resume the pursuit of their livelihoods is simply an incidental effect.

The claimant bears the burden of establishing its litigation costs are out of proportion to its personal stake in the matter. (*Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106, 113 [212 Cal.Rptr. 485].) Plaintiff did not meet this burden.

## II

Defendants renew their trial court contention that the attorney fees award chills the exercise of their First Amendment rights. Again, I agree.

"[E]xpression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.' *Carey* v. *Brown*, 447 U.S. 455, 467 [65 L.Ed.2d 263, 273, 100 S.Ct. 2286]. '[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.' *Garrison* v. *Louisiana*, 379 U.S. 64, 74-75 [13 L.Ed.2d 125, 132-133, 85 S.Ct. 209]. There is a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.' *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 270 [11 L.Ed.2d 686, 700, 84 S.Ct. 710, 95 A.L.R.2d 1412]." Thus spoke the United States Supreme Court in *NAACP* v. *Claiborne Hardward Co.* (1982) 458 U.S. 886, 913 [73 L.Ed.2d 1215, 1236, 102 S.Ct. 3409].

In their activities at plaintiff's abortion clinic, defendants expressed their views on a national controversy that has deeply divided the country. To say that the manner of expression was robust and uninhibited understates the case. Indeed, it was strident, accusatory and confrontational. "Strong and effective extemporaneous rhetoric cannot be channeled in purely dulcet phrases." (*NAACP* v. *Claiborne Hardware Co.*, *supra*, 458 U.S. at p. 928 [73 L.Ed.2d at p. 1246].) Nevertheless, the defendants' message was well within the bounds of constitutionally protected speech. For example, defendants

shouted "murder, murder, murder," at women entering the clinic, and implored them not to "kill" their babies. Representative of the messages on the signs and posters displayed by defendants were these: "Abortion Kills Babies, Stop the Holocaust"; "Abortion, the Ultimate Child Abuse"; "Dr. Bruce Steir Butchers Babies Here"; "[Shauna] Heckert's Baby Hackery"; "Abortion, An Act of Raw Power."[1]

Defendants, or at least some of them, also engaged in activities that are not constitutionally protected or otherwise privileged. For example they at times blocked ingress to the building and the parking lot and impeded patients and others attempting to approach and enter the clinic. But it grossly distorts the record to suggest that defendants' activities involved a continuous, unbroken series of illegal acts unrelieved by the pristine exercise of free expression. In fact, it is the latter, constitutionally protected activity that predominated and thus more accurately characterizes defendants' activities.[2]

By their conduct, defendants demonstrated their passionate devotion to what is commonly known as the prolife cause. While I do not condone the unlawful excesses by which defendants' fervor sometimes manifested itself, I do not doubt that defendants' underlying purpose was to protest activity which, according to their understanding, was violative of natural law, even though that activity has been expressly sanctioned by the highest judicial tribunal in the land. That is political speech pure and simple, and when lawfully expressed, is entitled to constitutional protection.

Speech and conduct cannot neatly be separated. Indeed, it is difficult to imagine how speech can be an effective vehicle for communication of ideas

---

[1] The latter message appears to be a send-up of Justice White's dissent in *Roe* v. *Wade* (1973) 410 U.S. 113 [35 L.Ed.2d 147, 93 S.Ct. 705]. Justice White excoriated the *Roe* v. *Wade* majority for its "exercise of raw judicial power" in "fashion[ing] and announc[ing] a new constitutional right for pregnant mothers" without support "in the language or history of the constitution." (*Roe* v. *Wade, supra,* 410 U.S. at pp. 221-222 [35 L.Ed.2d at pp. 195-196] (dis. opn. of White, J.).)

[2] Perpetrators of violence can claim no sanctuary in the First Amendment no matter how pure or well-intentioned their motives or their message. While there is evidence of physical contact between some of the defendants and some of plaintiff's employees and patients, it was confined to bumping, shoving and blocking and, as the trial court found, was engaged in by partisans on both sides of this controversy. Defendants had no right forcibly to commandeer an audience to hear their message nor to impede access to plaintiff's clinic, and plaintiff and its agents had no right forcibly to interfere with defendants' attempts peacefully to communicate. By enjoining defendants from conducting their activities in specified areas adjacent to the clinic, the trial court sought to foreclose any repetition of this conduct. While I do not condone this conduct in any circumstances, given the numbers of persons involved and the period of months in which the protest activities took place, the incidence of, and level of force used in such physical encounters hardly justify the extravagant characterization of defendants' activities as "violent."

unaided by conduct of some kind. The precise line between conduct protected as a necessary adjunct to free expression and conduct which cannot claim that protection is not a bright one. It can be ascertained only by a delicate balancing of the competing rights at stake in concrete factual circumstances.

Because defendants' exercise of free expression collided with plaintiff's right to engage in lawful activity on its property, defendants' freedom of expression could be restricted. Defendants were enjoined from conduct which directly interfered with plaintiff's conduct of lawful activity on its business premises. On the other hand, recognizing the constitutional sanctity of free expression, the court rejected plaintiff's demand that defendants be precluded from demonstrating in the immediate vicinity of the clinic, i.e., at any location in which their activities could be observed from within the clinic.

Viewed in the historical context of First Amendment litigation, there is nothing particularly remarkable about this dispute or its resolution by the trial court. The exercise of free expression through demonstrations and picketing has a venerable history in the political life of our democracy and has played a vital role in influencing public policy. Yet on countless occasions courts have been called upon to rein in demonstrators and picketers whose passion and exuberance in furtherance of their causes has trenched upon the rights of others to engage in lawful activities. For example, union members who broadcast their views in a labor dispute by picketing their employer's business frequently have been enjoined from conduct that unduly infringes upon the employer's property rights. And, as in this case, such conduct has often had the incidental effect of interfering with the constitutional rights of third parties. Thus in labor union-employer disputes, picketers frequently prevent nonstriking employees from pursuing their livelihoods. (See *Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R.1446] cited with approval in *Planned Parenthood* v. *Casey* (1992) 505 U.S. \_\_-\_\_ [120 L.Ed.2d 674, 696, 112 S.Ct. 2791].) If in those injunction proceedings individual union members (as distinct from the union itself) have been held personally liable for the employer's attorney fees it has escaped my notice and I would be astounded if it were to be allowed.[3]

In *NAACP* v. *Claiborne Hardware Co.*, *supra*, the defendants, Black persons seeking to achieve racial justice, were sued in state court for acting

---

[3]Unlike abortion rights, property rights and free speech rights enjoy express protection from government infringement in the federal Constitution. Property rights are protected expressly by Amendments V and XIV and implicitly by Amendments II, III and IV. Free speech rights are protected expressly by Amendment I. In contrast, the constitutional right to an abortion derives either from "penumbras . . . formed by emanations from" the specific guarantees of the Bill of Rights (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 484 [14

in concert to boycott a number of White merchants. The boycott was marred by a number of illegal acts. The United States Supreme Court characterized it as " 'chameleon-like' . . . includ[ing] elements of criminality and elements of majesty." (458 U.S. at p. 888 [73 L.Ed.2d at p. 1221].) The Supreme Court reversed a joint and several judgment against defendants and in favor of the White merchants for injunctive relief and damages for business losses due to the boycott plus attorney fees. The court held the nonviolent activities of defendants are entitled to First Amendment protection. (458 U.S. at p. 915 [73 L.Ed.2d at p. 1237].) "While the State legitimately may impose damages for the consequences of violent conduct, it may not award compensation for the consequences of nonviolent, protected activity. Only those losses proximately caused by unlawful conduct may be recovered." (458 U.S. at p. 918 [73 L.Ed.2d at p. 1240].) " 'In this sensitive field, the State may not employ "means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton* v. *Tucker,* 364 U.S. 479, 488] [5 L.Ed.2d 231, 237, 81 S.Ct. 247] (1960).' *Carroll* v. *Princess Anne,* 393 U.S. 175, 183-184 [21 L.Ed.2d 325, 332-333, 89 S.Ct. 347]." (458 U.S. at p. 920 [73 L.Ed.2d at p. 1241].)

The court explained: "At times the difference between lawful and unlawful collective action may be identified easily by reference to its purpose. In this case, however, [defendants'] ultimate objectives were unquestionably legitimate. The charge of illegality—like the claim of constitutional protection—derives from the means employed by the participants to achieve those goals. The use of speeches, marches, and threats of social ostracism cannot provide the basis for a damages award. But violent conduct is beyond the pale of constitutional protection.

"The taint of violence colored the conduct of some of the [defendants]. They, of course, may be held liable for the consequences of their violent

---

L.Ed.2d 510, 514, 85 S.Ct. 1678]; *Roe* v. *Wade, supra,* 410 U.S. at pp. 152-153 [35 L.Ed.2d at pp. 176-177]) or is subsumed within the "heart of [the] liberty [interest]" "protected by the Fourteenth Amendment," an interest which, we are told, particularly protects the right "to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." (*Planned Parenthood* v. *Casey, supra,* 505 U.S. __, __ [120 L.Ed.2d 674, 698].) In time, perhaps, a less vaporous constitutional theory for abortion rights may be divined by jurists even more adept at creative construction, but we must accept the existing handiwork of our judicial betters, unconvincing though it may be. In any event, whatever may be the constitutional provenance of the right to an abortion, the right is not superior to other constitutionally protected rights such as free speech, property rights and the fundamental right to pursue one's livelihood which is also protected as a function of substantive due process (see *Meyer* v. *Nebraska, supra,* 262 U.S. 390 [67 L.Ed. 1042]). The notion implicit in the canon of many supporters of abortion rights that the right to an abortion trumps all other constitutional rights is simply a faddish conceit. In this case, of course, plaintiff does not contend that government is unconstitutionally trenching on its property rights or on the rights of plaintiff's clients to an abortion. However, defendants do contend government is infringing upon their protected free speech rights by virtue of the judgment against them for plaintiff's attorney fees.

deeds. *The burden of demonstrating that it colored the entire collective effort, however, is not satisfied by evidence that violence occurred or even that violence contributed to the success of the boycott. A massive and prolonged effort to change the social, political, and economic structure of a local environment cannot be characterized as a violent conspiracy simply by reference to the ephemeral consequences of relatively few violent acts. Such a characterization must be supported by findings that adequately disclose the evidentiary basis for concluding that specific parties agreed to use unlawful means, that carefully identify the impact of such unlawful conduct, and that recognize the importance of avoiding the imposition of punishment for constitutionally protected activity. The burden of demonstrating that fear rather than protected conduct was the dominant force in the movement is heavy.* A court must be wary of a claim that the true color of a forest is better revealed by reptiles hidden in the weeds than by the foliage of countless freestanding trees. The findings of the [state trial judge] . . . are constitutionally insufficient to support the judgment that [defendants] are liable for all losses resulting from the boycott." (458 U.S. at pp. 933-934 [73 L.Ed.2d at p. 1249], italics added.)

In respect to the joint and several judgment against defendants for plaintiff's attorney fees, the facts here are closely analogous to those in *Claiborne*. A monetary award for attorney fees has no less a chilling effect on the exercise of First Amendment rights than if the award were denominated one for compensatory damages. Such a distinction would be utterly sophistical. The exaction of money from defendants will burden them with the same baleful economic consequences no matter the label on the judgment. Moreover, notwithstanding the illegal acts of some of the defendants some of the time, defendants' primary purpose was to communicate their views on a highly controversial issue of great public interest and concern. Most of defendants' activities in furtherance of that purpose were lawful and thus constitutionally protected. The trial court's findings do not parse out the legal from the illegal conduct or fix the responsibility individually for illegal acts and the proportionate impact of illegal conduct on plaintiff's litigation costs.[4] Conversely, the trial court made no finding on the extent to which plaintiff's litigation costs were increased by the unsuccessful effort to limit defendants' picketing activities to areas further removed from the clinic,

---

[4]The majority implies defendants have waived any claim the trial court erred in failing to distinguish between constitutionally protected and unprotected conduct in assessing attorney fees. (See, e.g., maj. opn., *ante*, fn. 7 at p. 1672.) From the outset defendants have maintained that fixing them with liability for attorney fees would chill their rights of free speech because their conduct was constitutionally protected. It is clear from the record that a good deal of their conduct was constitutionally protected and the fact that, contrary to defendants' contention, some was not hardly operates to forfeit their claim to constitutional protection in its entirety.

relief which the trial court refused presumably because it would be an unreasonable restriction on defendants' constitutionally protected rights of free expression. The record simply will not support a monetary judgment against defendants the inevitable consequence of which will be to stifle the exercise of First Amendment rights not only by defendants but by all others who in the future will forswear their rights because they cannot afford financial penalties much less financial ruin as the price of exercising constitutionally guaranteed rights.[5]

By "constitutionalizing" the right to abortion the highest court in the land has preempted any policymaking role by the political branches of government in respect to abortion. Citizens dissatisfied with public policy governing abortion can no longer look to their legislators for change. But the high court did not *and could not* foreclose further political debate on the subject. This is, after all, the United States of America, not the "Evil Empire." What the high court did do, however, is to constitute the streets the primary, if not the only, forum for that debate. Debate in the forum of the streets lacks the orderliness and civility of the legislative forum to which citizens could otherwise repair to influence public policy. Street debaters are not governed by Robert's Rules of Order. Given these realities, we should not be "slow to recognize that the protection of the First Amendment bars subtle as well as obvious devices by which [its guarantees] might be stifled." (*NAACP* v. *Claiborne Hardware Co.*, *supra*, 458 U.S. at p. 932 [73 L.Ed.2d at p. 1248].)

I would reverse the judgment for attorney fees in its entirety.

Appellants' petition for review by the Supreme Court was denied June 1, 1995.

---

[5] In opposition to plaintiff's request for attorney fees, defendants filed declarations of their financial status showing that they are people of very modest resources. In responding points and authorities plaintiff airily dismissed these declarations as "verbal garbage." Defendants' declarations stand uncontradicted.